**PRIEBE & SONS, Inc., v. UNITED STATES.**

No. 45922.

Court of Claims.

May 6, 1946.

458

JONES, Judge, dissenting.

————◆————

J. Arthur Miller, of Chicago, Ill. (Campbell, Clark & Miller, of Chicago, Ill., and Morris, Kixmiller & Baar and Allen H. Gardner, all of Washington, D. C., on the brief), for plaintiff.

S. R. Gamer, of Washington, D. C., John F. Sonnett, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

LITTLETON, Judge.

The only question presented in this case is whether plaintiff is entitled to recover $14,482.90 liquidated damage deducted by defendant under the express terms of a contract by reason of the failure of plaintiff to have certain quantities, totalling 114,829 pounds, of dried eggs manufactured, inspected, tested, accepted and ready for delivery or shipment in part at Manning, Iowa, and in part at Sleepy Eye, Minn., on the contract date of May 18, 1942. Six certain lots of the eggs at these two points were not ready for delivery until May 20, 21, and 22, respectively, and the stipulated liquidated damage of 10 cents a pound was accordingly charged and deducted from amounts otherwise due plaintiff. This contract called for 200,000 pounds but the balance of 45,945 pounds is not here in question.

In 1941 the Government through the Agricultural Marketing Administration (herein referred to as AMA) and the Federal Surplus Commodities Corporation (herein referred to as FCC), agencies of the Department of Agriculture, entered upon a program of purchasing, through contracts, dried or powdered eggs. Plaintiff commenced its dried egg business almost at the inception of this program and did a very large amount of such business under such contracts with FCC before and after April 23, 1942, the date of the contract for dried eggs involved in this case. Plaintiff was familiar with the program, the details of the Government operations in connection therewith, and the relationship of the program to the war effort.

The contract in suit was entitled "Announcement FSC-553, Purchase of Dried Egg Products."

The detailed facts, about which there is no dispute, concerning the making on April 23, 1942, of the written contract in suit and the terms and conditions thereof are set forth in findings 3-5. Plaintiff fixed the delivery date of May 18, 1942, for the 200,000 pounds of dried eggs (herein sometimes called powder) called for by the contract under par. 1(c) thereof, which required that the seller state "The beginning date of the delivery period during which the vendor agrees to make delivery (N. B. Par. 7—Delivery)." Paragraphs 3 and 4 related to inspection and grading and the chemical analysis to be used in the examination and testing of samples (finding 3). Paragraph 4 required that inspection of the powder must be by the AMA and made it incumbent on plaintiff to arrange for such service. In addition it was provided that "Inspection and weight certificates shall be issued at the expense of the vendor. Inspection and weight certificates shall be dated not more than 30 calendar days prior to the delivery date specified in the offer. The lots delivered to the FSCC must be the lots sampled and inspected by the AMA, and the grading certificates tendered the FSCC must name the manufacturer of the product, his identifying production lot number for the barrels in question, and the date of manufacture." Inspection certificates were issued and dated on the day defendant completed the analysis of samples at its Chicago Laboratory and plaintiff was immediately notified by wire whether the

samples had or had not met the required test and was given the number of each certificate for each lot so inspected. There was no delay in inspecting, weighing, taking samples of each lot and analyzing them. The AMA inspector weighed and took samples of each of the six lots here involved on the first or second day after completion of manufacture and these samples were tested and analyzed as promptly as was possible. The final inspection certificates for the powder here involved were issued from 4 to 7 days after the date on which samples of each lot were taken. Plaintiff does not claim that inspection certificates should or could have been issued earlier.

Paragraphs 7 and 9 of the contract provided, so far as here material, as follows:

"Par. 7. Delivery: The date specified in the offer, pursuant to item C, shall be the first day of a 10-day period within which the FSCC will accept delivery, the particular day within the period being at the FSCC's option. Save for the exception noted below, failure to have specified quantities of dried egg products inspected and ready for delivery by the date specified in the offer will be cause for invoking the provisions of paragraph 9 below. The only exception against invoking the provisions of paragraph 9 shall be when sampling and inspection by the Agricultural Marketing Administration had been requested for a date at least 10 days prior to the date specified in the offer, pursuant to item C and the sampling and inspection services were not forthcoming.

"Dried eggs tendered for delivery must be accompanied by the original and two copies of the inspection and weight certificate issued by the Agricultural Marketing Administration and other affidavits and statements stipulated in this announcement.

\*    \*    \*    \*    \*    \*

"Par. 9. Delays—Damages: Payment: Inasmuch as the failure of the vendor to deliver the quantity of the commodity or commodities specified in the contract in accordance with the terms of this announcement will, because of the urgent need for the commodity by the purchaser arising from the present emergent conditions, cause serious and substantial damages to the purchaser, and it will be difficult, if not impossible, to prove the amount of such damages, the vendor agrees to pay to the FSCC liquidated damages as stated in this paragraph. The sum is agreed upon as liquidated damages and not as a penalty, and shall be in the amount set forth below for each pound of dried egg product undelivered in accordance with the terms of this announcement.

*Liquidated damage sum*

Contracted delivery (date specified in offer):

Within and including 50 days of acceptance date .................. $0.10

\*    \*    \*    \*    \*    \*

"The parties have computed, estimated, and agreed upon this sum as an attempt to make a reasonable forecast of probable actual loss because of the difficulty of estimating with exactness the damages which result. However, if the President of the Federal Surplus Commodities Corporation determines that the failure to make delivery as herein agreed results from unforeseeable causes and without the fault or negligence of the vendor, the President of the Federal Surplus Commodities Corporation, upon request of the vendor, may extend the time for making delivery for such time as he deems reasonable under the circumstances and in view of the urgent needs of the purchaser. The President may delegate to any officer or employee or agent of the Federal Surplus Commodities Corporation the power herein given to determine whether the failure to deliver is due to unforeseeable causes beyond the control and without fault or negligence on the part of the vendor, and the determination of the President of the Federal Surplus Commodities Corporation or such officer or employee or agent in this respect shall be final and conclusive on the parties concerned."

The liquidated damage of $14,482.90 at the agreed rate of 10 cents a pound was imposed and deducted from the contract price in making payments to plaintiff for the 114,482 pounds of powder in question. Plaintiff appealed to the President of FCC for remission of the liquidated damage and its appeal was considered and denied, as was also a petition and brief for reconsideration.

Plaintiff admits that it was at fault in not having the powder ready for delivery on May 18, but argues that paragraphs 1, 7, and 9 of the contract, which had to do with liquidated damage, did not intend that the stipulated liquidated damage should be exacted where there had "been no possibility of actual damage" due to failure to have the eggs inspected and ready for delivery on or before May 18; that there was no such possibility of damage in this case because the inspection certificates were issued on May 20, 21, and 22, 1942, respectively, and defendant did not give notice of call for delivery of the eggs f. o. b. Manning, Iowa, and Sleepy Eye, Minn., until May 26, 29, and June 4, respectively; and that if it should be held that the contract intended to make the liquidated damage due if the eggs were not ready for delivery on May 18 because it was contemplated by the contract that the FCC might have given notice to deliver on that date, "plaintiff could have shipped other dried eggs certified before that date." We think none of these contentions can be sustained under the terms of the contract and the evidence of record. The language of paragraphs 1, 3, 4, 7, and 9 relating to the delivery date, inspection certificates and liquidated damage is very plain and unambiguous, and there is no room for construction.

Plaintiff, however, seeks to find an ambiguity by referring to the 10-day period allowed FCC to call for shipment of the powder and says it must have been intended by that provision that the 10-cents-a-pound damage would accrue if the powder was not inspected and ready when called for. Paragraph 7 appears to have been designed and intended to avoid just such a claim by expressly providing that the delivery date intended by the contract "shall be the first day of a 10-day period"; that "failure to have specified quantities of dried egg products inspected and ready for delivery by the date [May 18] specified in the offer will be cause for invoking the provisions of paragraph 9," which provided for the payment of liquidated damage of 10 cents a pound for a delay up to 50 days in the event of failure of plaintiff to have the eggs ready for delivery in accordance with the terms of the contract. Moreover, para-

graph 7 provided that the only exception against exaction of the liquidated damage under paragraph 9 "shall be when sampling and inspection * * * had been requested for a date at least 10 days prior" to May 18, "and the sampling and inspection services were not forthcoming." The phrase "undelivered in accordance with the terms of this announcement [contract]" appearing in paragraph 9 must be read in the light of paragraph 7 and, when so read, it is clear that the phrase meant the delivery date of May 18. The provisions as to the delivery date and liquidated damage were clearly directed to the matter of having the eggs manufactured, inspected, and ready for delivery on or before May 18, to the end that defendant might carry on its dried-egg program with assurance that it could count on the dried-egg products being ready on the specified date. Plaintiff was thoroughly familiar with the reasons which made this requirement necessary. It is also clear from paragraph 7 that the option. given defendant to call for shipment within 10 days after the delivery date of May 18 had no connection with the matter of payment of the stipulated liquidated damage; that option was given, as plaintiff knew, in order to provide defendant with a leeway of 10 days in connection with available storage, packaging and shipping facilities (finding 16).

With reference to plaintiff's contention that it could have delivered and shipped to the FCC other dried eggs which had been inspected and certified prior to May 18, it appears, as set forth in detail in finding 15, that the other eggs referred to did not belong to plaintiff but had been processed by F. M. Stamper & Co., at Moberly and St. Louis, Mo., and L. D. Schreiber & Co., Inc., at Manning, Iowa, under other contracts with FCC to which contracts such eggs were obligated by the inspection certificates issued thereon and for the fulfillment of which contracts the eggs were being held subject to notice of call. While it may be true that plaintiff was on such terms with those companies that it could have obtained their consent to the transfer of those inspected eggs to apply on plaintiff's May 18 contract, it did

not attempt to do so and it could not have done so without defendant's consent and approval. Whether defendant would have approved such transfer does not appear. Such a transfer might have left Stamper & Co., and Schreiber & Co., subject to liquidated damage on their contracts. Since those eggs and inspection certificates were committed to other contracts the eggs were not available for delivery by plaintiff on May 18 under the contract in suit within the meaning of paragraphs 1(c) and 7 thereof.

Finally, plaintiff argues that in view of the circumstances the amount collected as liquidated damage was in reality a penalty which the court should refuse to enforce. We find no merit in this contention in view of the facts and circumstances disclosed by the evidence and the express agreement of the parties that the agreed liquidated damage of 10-cents a pound was not a penalty. We can find nothing in the contract or in the evidence which would justify the conclusion that the contract intended that the sum agreed to be paid would be liquidated damages if the eggs were called for on May 18 and were not then inspected and ready and would be a penalty if such eggs were not inspected and ready on that date but not called for prior to issuance of the required inspection certificate. On the contrary the circumstances and the language used by the parties negative such an interpretation of the contract. United States v. Bethlehem Steel Co., 205 U.S. 105, 118-122, 27 S.Ct. 450, 51 L.Ed. 731.

Plaintiff is not entitled to recover, and the petition is, therefore, dismissed. It is so ordered.

WHITAKER, Judge, and WHALEY, Chief Justice, concur.

JONES, Judge (dissenting).

There was no delay in the actual delivery of the eggs. It is admitted that plaintiff made prompt delivery of all shipments as requested. There being no delay in the delivery of the product there was no occasion to assess liquidated damages.

Had the Government desired earlier shipment, within the date specified, and had the plaintiff been unable to promptly comply due to any failure to have the eggs dried, inspected, and ready for shipment, it would have been entirely proper to assess liquidated damages, since the actual damages would have been difficult to establish. No such state of facts is presented here. All deliveries were made without any delay whatever.

Both plaintiff and defendant were operating under great difficulties. Wartime shortages are frequently cruel to both the producer of the article and the nation that has overwhelming need of the supply. I appreciate the fact that it was necessary for the Government to have a strong protective provision in order to assure that every effort would be made to have the essential supplies ready when needed. But the very strength of the provision calls for a fair interpretation and a just application.

A careful reading of the provisions of the contract takes away all basis of the Government's claim to make a deduction. Paragraph 7 says that "Failure to have specified quantities of eggs inspected and ready for delivery by the date specified in the offer will be cause for invoking the provisions of paragraph 9."

Paragraph 9 provides that "Failure to *deliver* the quantity specified in the contract in accordance with the terms of the announcement" shall be ground for assessing liquidated damages. [Italics supplied.] Concededly there was neither failure of nor delay in delivery. The facts do not meet the specifications required as a condition to the assessing of liquidated damages. The fact that the Government could have asked for earlier delivery but didn't is not sufficient grounds for penalizing the plaintiff. The case of United States v. Bethlehem Steel Co., cited in the court's opinion, is inapplicable since in that case there was delay in delivery.

To construe the contract in such a way as to require plaintiff to have the goods ready for delivery even though the defendant was not ready to accept them, and at the same time permit the defendant to delay taking them or to refuse to take them altogether, putting plaintiff to the expense of storage and possibly loss through spoil-

age with no obligation on the part of the Government to accept them, would be an extreme interpretation.

Failure to comply with paragraph 7 simply brings paragraph 9 into play. Paragraph 9 governs the assessing of liquidated damages. Its terms limit defendant's right to assess damages to "Failure to deliver" and not to mere failure to have been ready for delivery at a previous time. This seems perfectly clear to me.

There were no damages. There could have been none until the Government was ready to accept shipment. In the circumstances of this case liquidated damages should not be assessed.

MADDEN, Judge, took no part in the decision of this case.