## PRIEBE & SONS, INC. *v.* UNITED STATES.

No. 16.   Argued October 13, 1947.—Decided November 17, 1947.

*J. Arthur Miller* and *Allen H. Gardner* argued the cause for petitioner. With them on the brief was *Samuel Williston.*

*Philip Elman* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Ford, Paul A. Sweeney* and *Melvin Richter.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This case, here on certiorari to the Court of Claims, presents the question whether a provision in a government contract for "liquidated damages," as construed and applied, should be denied enforcement on the ground that it constitutes a "penalty."

Shortly after the enactment of the Lend-Lease Act of March 11, 1941, 55 Stat. 31, 22 U. S. C. (Supp. V, 1946), § 411 *et seq.,* the United States acting through agencies of the Department of Agriculture embarked on a program of purchasing dried eggs for shipment to England and Russia. Petitioner agreed to furnish a quantity of dried eggs under that program to the Federal Surplus Commodities Corporation (FSCC). The contract called for "May 18 [1942] delivery" which date, according to the contract, "shall be the first day of a 10-day period within which the FSCC will accept delivery, the particular day within the period being at the FSCC's option." Petitioner was also required to have the eggs inspected, delivery to be accompanied by inspection and weight certificates.

The contract contained two provisions respecting "liquidated damages." One, contained in paragraph 9, was

applicable to delays in delivery.[1]   It has no application here, for as we shall see, deliveries were timely.   The provision for "liquidated damages" with which we are concerned is contained in paragraph 7 and is applicable to a totally different situation.   It provides, with exceptions not material here, that "failure to have specified quantities of dried egg products inspected and ready for delivery by the date specified in the offer" will be cause for payment of "liquidated damages."[2]

On May 18, 1942, petitioner had not made delivery nor had the eggs been inspected.   Inspection was, however, completed and certificates issued by May 22, which was prior to the time when FSCC asked for delivery. For it was not until May 26 that FSCC gave the first of several written notices for the shipment of eggs involved in this litigation.   Petitioner made timely shipments pursuant to those instructions.   Subsequently FSCC ascer-

---

[1] That provision of the contract provided:

"Inasmuch as the failure of the vendor to deliver the quantity of the commodity or commodities specified in the contract in accordance with the terms of this announcement will, because of the urgent need for the commodity by the purchaser arising from the present emergent conditions, cause serious and substantial damages to the purchaser, and it will be difficult, if not impossible, to prove the amount of such damages, the vendor agrees to pay to the FSCC liquidated damages as stated in this paragraph.   The sum is agreed upon as liquidated damages and not as a penalty and shall be in the amount set forth below for each pound of dried egg product undelivered in accordance with the terms of this announcement. . . .   The parties have computed, estimated, and agreed upon this sum as an attempt to make a reasonable forecast of probable actual loss because of the difficulty of estimating with exactness the damages which result."

The "liquidated damages" ranged from 10 to 30 cents per pound dependent upon the elapsed time between the acceptance date and May 18, 1942.

[2] The measure of "liquidated damages" in this situation was the same as that for delays in delivery set forth in note 1, *supra*.

tained that petitioner's inspection certificates had been issued after May 18 and accordingly deducted from the price 10 cents per pound on the theory that the failure to have the eggs inspected and ready for delivery by May 18 was a default which put into operation the "liquidated damages" provision of the contract.

Petitioner brought this suit in the Court of Claims to recover the amounts withheld plus interest. The Court of Claims, being of the view that there had been a breach of contract for which the United States was entitled to "liquidated damages," dismissed the petition. 106 Ct. Cl. 789, 65 F. Supp. 457.

We construe the contract to mean that the time for delivery by petitioner was not May 18, 1942 but the time or times chosen by the FSCC within the ten-day period which began on May 18. That is to say, performance by petitioner was not due until request was made and instructions given for delivery. That interpretation is in accord with the uncontested finding of the Court of Claims that petitioner promised delivery "within a ten-day period commencing May 18, the precise date to be selected" by the FSCC.

The contract was drawn, however, to make the "liquidated damages" provisions include so-called defaults of petitioner which antedated the time when delivery was due but which in no way interfered with or caused delay in that performance. As noted, "liquidated damages" became payable on "failure to have specified quantities of dried egg products inspected and ready for delivery by the date specified in the offer," viz. by May 18, 1942. The Court of Claims held this provision enforceable even though petitioner had made prompt delivery of the eggs, because it felt that the provision enabled respondent to carry on its dried-egg program "with assurance that it could count on the dried-egg products being ready on the specified date." That position is amplified by respond-

ent.   The argument in short is that liability to pay "liquidated damages" for failure to have goods ready for delivery even prior to the time when delivery is due gives assurance against tardy deliveries; that a prompt timetable of shipments was important here because of war conditions and the necessity of having goods ready for loading whenever shipping space was available; that delay in deliveries would cause unmeasurable damage; and that even though no damage were apparent in a particular case, the "liquidated damages" provision should be enforced as a deterrent of tardy deliveries in the whole class of contracts relating to this procurement program.

It is customary, where Congress has not adopted a different standard, to apply to the construction of government contracts the principles of general contract law. *United States* v. *Standard Rice Co.,* 323 U. S. 106, 111, and cases cited.   That has been done in other cases where the Court has considered the enforceability of "liquidated damages" provisions in government contracts.   *United States* v. *Bethlehem Steel Co.,* 205 U. S. 105, 120–121; *Wise* v. *United States,* 249 U. S. 361, 365–366.   We adhere to those decisions and follow the same course here.

Today the law does not look with disfavor upon "liquidated damages" provisions in contracts.   When they are fair and reasonable attempts to fix just compensation for anticipated loss caused by breach of contract, they are enforced.   *Wise* v. *United States, supra,* p. 365; *Sun Printing & Pub. Assn.* v. *Moore,* 183 U. S. 642, 672–674; Restatement, Contracts § 339; *Dunlop Pneumatic Tyre Co.* v. *New Garage & M. Co.,* [1915] A. C. 79.   And see *Kothe* v. *Taylor Trust,* 280 U. S. 224, 226.   They serve a particularly useful function when damages are uncertain in nature or amount or are unmeasurable, as is the case in many government contracts.   *United States* v. *Bethlehem Steel Co., supra,* p. 121; *Clydebank Engineering & Shipbuilding Co.* v. *Castaneda,* [1905] A. C. 6, 11–13, 20;

*United States* v. *Walkof,* 144 F. 2d 75, 77. And the fact that the damages suffered are shown to be less than the damages contracted for is not fatal. These provisions are to be judged as of the time of making the contract. *United States* v. *Bethlehem Steel Co., supra,* p. 121.

Judged by these standards, the provision in question may not be sustained as an agreement for "liquidated damages." It does not cover delays in deliveries.[3] It can apply only where there was prompt performance when delivery was requested but where prompt delivery could not have been made, due to the absence of the certificates, had the request come on the first day when delivery could have been asked. A different situation might be presented had the contract provided for notice to the Government when the certificates were ready. Then we might possibly infer that promptness in obtaining them served an important function in the preparation of timetables for overseas shipments. But the contract contains no such provision; and it is shown that FSCC had no knowledge that the certificates were not ready on May 18 until long after deliveries had been made. So, it is apparent that the certificates were only an essential of proper delivery under this contract.

It likewise is apparent that the only thing which could possibly injure the government would be failure to get prompt performance when delivery was due. We have no doubt of the validity of the provision for "liquidated damages" when applied under those circumstances. *United States* v. *Bethlehem Steel Co., supra; Wise* v. *United States, supra.* And see *Maryland Dredging Co.* v. *United States,* 241 U. S. 184; *Robinson* v. *United States,* 261 U. S. 486. But under this procurement program delays of the contractors which did not interfere with

---

[3] They are covered, as we have already noted, by the provision set forth in note 1, *supra.*

prompt deliveries plainly would not occasion damage. That was as certain when the contract was made as it later proved to be. Yet that was the only situation to which the provision in question could ever apply. Under these circumstances this provision for "liquidated damages" could not possibly be a reasonable forecast of just compensation for the damage caused by a breach of contract. It might, as respondent suggests, have an *in terrorem* effect of encouraging prompt preparation for delivery. But the argument is a tacit admission that the provision was included not to make a fair estimate of damages to be suffered but to serve only as an added spur to performance. It is well-settled contract law that courts do not give their imprimatur to such arrangements. See *Kothe* v. *Taylor Trust, supra;* Restatement, Contracts § 339. All provisions for damages are, of course, deterrents of default. But an exaction of punishment for a breach which could produce no possible damage has long been deemed oppressive and unjust. See Salmond & Williams on Contracts (2d ed. 1945) § 202.

It is said, however, that a different rule should obtain here because of the broad procurement powers involved under the Lend-Lease Act. We are pointed, however, to no provision by which the Congress authorized the imposition of penalties as sanctions to that program; nor do we find any. We cannot infer such a power. The power to purchase on appropriate terms and conditions is, of course, inferred from every power to purchase. But if that is the source of congressional authority to impose penalties, then any procurement officer, in war or in peace, could impose them. That is contrary to the premise underlying all our decisions on this question which involve government contracts. The rule which they announce has been applied both to the exigencies of war

(*United States* v. *Bethlehem Steel Co., supra*) and of peace (*Wise* v. *United States, supra*). The other view is such a radical break with the past and so counter to the whole development of the law as to indicate that the congressional purpose should be plain before we take the step.

*Reversed.*

Mr. Justice Black, with whom Mr. Justice Murphy agrees, dissenting.

The Court today invokes elusive and uncertain principles of "general contract law" to strike down a clause in a government contract executed under the recognized congressional authority of the Lend-Lease Act. Without reliance upon any indication of congressional policy, the Court assumes that it can discover somewhere a "general contract law," and that it is empowered to apply this law to wartime contracts of the Federal Government. I regard the decisions of this Court since *Erie R. Co.* v. *Tompkins,* 304 U. S. 64, as having established that the construction and validity of *all* government contracts are governed by federal law, whether executed under authority of the Lend-Lease Act or any other. *Metropolitan Bank* v. *United States,* 323 U. S. 454, 456; see *United States* v. *Allegheny County,* 322 U. S. 174, 183; *Clearfield Trust Co.* v. *United States,* 318 U. S. 363. And Congress has enacted many laws, both general and specific in nature, to guide all contracting agents of the Federal Government, 41 U. S. C. §§ 1 *et seq.,* as well as many detailed rules applicable solely to certain categories of contracts. See, *e. g.,* Merchant Marine Act of 1936, 49 Stat. 1985, Titles V, VII, VIII. But I can find no act of Congress which expressly or impliedly prohibits such generally authorized agents from making a contract containing a liquidated damage provision such as here involved.

Nor has Congress ever intimated that contracts within the general powers of government agents should be invalidated by this Court's invocation of a nebulous "general contract law," or because such contracts failed to harmonize with this Court's views of what is "fair and reasonable." I had not supposed that the federal courts were vested with such supervisory and revisory powers over the terms of contracts voluntarily and advisedly entered into by business groups with congressionally authorized government agents.

The available indications of congressional policy point to the very opposite conclusion. Far from indicating a hostility to liquidated damage clauses, Congress has made it mandatory that such clauses to protect against delay in performance be inserted in all government building contracts; and it has provided that such clauses "shall be conclusive and binding upon all parties" without the necessity for the Government to prove "actual or specific damages sustained . . . by reason of delays . . . ." 32 Stat. 326; 40 U. S. C. § 269. Surely this provision would not permit federal judges to ignore liquidated damage clauses in building contracts because actual damages were not proved and could not have been reasonably forecast. And in no other act of Congress is there a suggestion that liquidated damage provisions in other government contracts are unenforceable because the courts believe no actual damages could be sustained from a breach. Yet the majority adopts such a principle today to invalidate a clause in this contract, and thereby, as I see it, embarks upon the very undesirable practice of supervising and revising the congressionally authorized conduct of federal contracting agents. This Court has previously refused to initiate such a practice in a case where the Government on most appealing grounds urged us to revise its agent's contract. *United States* v. *Bethlehem Steel Corp.*, 315 U. S. 289, 308–309.

In this case procurement officers of the Federal Government, admittedly acting within their authority, advertised for bids for the sale of dried eggs which the advertisement provided were to be ready for delivery to the Government on a date to be chosen by the bidder. Actual delivery of the eggs was to be made on the Government's demand any time within a ten-day period following the ready date named by the bidder. The advertisement also contained a provision for the assessment of liquidated damages for delay in delivering the eggs or in having them inspected, certified, and ready for delivery by the bidder's chosen date.

The efficient integration of a large-scale procurement program, such as was here involved, made it highly advisable for the Government to exact assurances that goods would be ready for delivery in advance of selection of the date for actual delivery. Essential to the program was the coordinated movement of boxcars and ships, both of which were then scarce and in great demand. Each day's idleness of cars and ships might mean injuries to the Government of large but uncertain amounts. Under such circumstances it would have been a serious omission for government agents to fail to check and double check, contract and double contract, in order to have goods ready for delivery to cars and ships with the least possible lost time in the use of transport facilities. And the Government had a right to depend on its contractors living up to their promise to have goods ready on the date they said they would so that the Government might thereafter select a delivery date with certainty that no transportation delays would occur. Failure to do so might well disrupt the Government's prearranged train and ship schedules, causing it cumulative difficulties not easily translated into money damages. And all of these damages might result from failure to have the goods ready as promised, even

though the contractor might later be able to deliver when called for and thus escape the delivery liquidated damage provision.

This contract was made at arm's length. The petitioner knew of the necessity for faithful performance of its obligations. It undoubtedly gave consideration to this fact and fixed its price high enough to satisfy itself of its profits. I can think of no persuasive reason why it should now be relieved of the obligation it advisedly assumed which was, in effect, to charge less for its goods if they were not ready for delivery on the date it promised. I do not deny that this Court can fill gaps in statutes so as to execute broad congressional purposes and that courts generally have made large contributions to laws governing contracts. But I think that the Court here makes a law which frustrates congressional purposes and tends most unwisely to handicap government purchasing agents in the performance of their authorized duties. I adhere to the belief that it is unwise for the courts to interfere with the making of contracts by government agents in harmony with valid congressional authority. *Perkins* v. *Lukens Steel Co.,* 310 U. S. 113, 127–128, 131–132. I would affirm this judgment.

Mr. Justice Frankfurter, whom The Chief Justice joins, dissenting.

Upon failure to perform the undertaking of a contract the law secures the money equivalent for the loss thereby incurred. In order to avoid the waste of controversy as to the extent of a loss, should it occur, and to save judges and juries from having to guess about it, parties, naturally enough, often stipulate in advance the compensation for such loss, and courts in appropriate situations will enforce such a provision for liquidated damages. But exactions for a breach of contract not giving

rise to damages and merely serving as added pressure to carry out punctiliously the terms of a contract, are not enforced by courts. In familiar language, penal provisions in a contract—those that concern defaults that bring no loss in their train—are not enforceable. I assume that the basic reason for this doctrine is that the infliction of punishment through courts is a function of society and should not inure to the benefit of individuals. So-called *qui tam* actions, suits for treble damages and the like, stand on a different footing. In such situations society makes individuals the representatives of the public for the purpose of enforcing a policy explicitly formulated by legislation. The essence of the law's remedy for breach of contract is that he who has suffered from a breach should be duly compensated for the loss incurred by non-performance. But one man's default should not lead to another man's unjust enrichment.

If the contract in controversy is to be treated as an ordinary commercial transaction, to be governed by the ordinary rules applicable also to Government contracts in ordinary times, I could not escape the conclusion that the provision for "damages" merely for failure to secure inspection certificates without failure of delivery operates as a penalty to deter non-observance of this requirement. It is not a determination in advance of the money lost to the Government due to default. The Government wanted delivery of eggs. But failure of delivery or inability to deliver for want of certificates brings into operation the provisions for liquidated damages of paragraph 9. There is no money loss to the Government through failure of any of the intervening preparatory steps in the process leading to delivery. Of course a contractor is interested in having the steps leading to performance duly carried out. Exactions for any of the intervening steps would undoubtedly have a coercive influence in securing per-

formance of that which is the real object of a contract. But if a contract is performed, the promisee has suffered no loss even though some intervening step by the promisor has been delayed. And so, such a provision for default of an intervening step, when due delivery has been made, is plainly exaction of an amount for which the promisee has not been out of pocket. Accordingly, if this contract were an ordinary commercial contract subject to the ordinary rules of the law of contract, I should have to find against the Government.

But this is not an ordinary peace-time Government contract. The Government may certainly assure performance of contracts upon which the effective conduct of the war depended by tightening the consequence of non-performance of each stage in the ultimate process of delivery of essential goods to the extent of having a tariff of deductions for non-performance of each step in the ultimate goal of the contract. Congress certainly could specifically authorize such pressures on each step in the sequence of a contract-performance by provisions like that of paragraph 7. Congress did not do this. Instead of particularizing to that extent, such a provision would, as a matter of fair construction, also be authorized by Congress if it empowered an agency to procure "under appropriate terms and conditions" essential war goods. I could not hold that an authority by Congress to a procurement agency to make contracts for carrying out the food program for the successful conduct of the war could not appropriately require of those who voluntarily enter into such contracts with the Government to incur a reasonable penalty for default for necessary certificates upon which delivery depended. And this would be so even though for reasons themselves relating to the war effort, the Government reserved a necessary margin of time within which to call for delivery and by a delayed

call obtained delivery when required, though if the call had been previously made the failure of certification might have been serious. Congress did not add to its authorization for entering into the making of these war contracts the assumed provision "with appropriate terms and conditions." But I find the distinction between what Congress did and the indicated addition too thin for denying to the contracting officers of the Government the implied right, under the circumstances of the times. Congress authorized the President, through appropriate delegation, to "procure . . . any defense article" deemed "vital to the defense of the United States." Section 3 (a) of the Lend-Lease Act of 1941, 55 Stat. 31. And so I conclude that the provisions of paragraph 7 were, on a fair reading of Congressional legislation, within the contracting powers of the President as much so as if Congress had in terms authorized such a provision.

It hardly needs to be added that neither formal logic nor practical judgment requires that authority to impose safeguards for preventing breaches short of ultimate default, similar to those contained in paragraph 7 of this contract for vital war products, be inferred from the ordinary implied powers of Government contracting officers in making ordinary contracts for the Government.

If one starts with the assumption that, in the absence of specific Congressional authority, a fixed rule of law precludes contracting officers from providing in a Government contract terms reasonably calculated to assure its performance even though there be no money loss through a particular default, there is no problem. But answers are not obtained by putting the wrong question and thereby begging the real one. It is misleading to ask: "What remedies has Congress provided for breaches of contract?" The answer to that depends on the answer to the true question: "With what scope has Congress pre-

sumably invested the Executive in order to carry out the duty, not defined with particularity, of assuring the necessary war supplies?"

The enforceability of a clause like that now in controversy, regardless of whether it is fairly to be regarded as one for "liquidated damages" or for a "penalty," is a matter of appropriate implications drawn from a total absence of expressed Congressional desire. Such implications do not rest on dogma. They derive from the considerations of policy underlying them. It is one thing to attribute to Congress the desire to confine the Government's remedies for breaches of its ordinary procurement contracts to the rules of law governing ordinary commercial contracts. It is quite another thing to infer that when in March, 1941, Congress gave the President, through the Lend-Lease Act, unrestricted power to "procure" essential war materials, it meant to fetter the procurement agencies selected by the President, by forbidding them to include, among the terms of bids to be voluntarily accepted, conditions reasonably calculated to secure performance.

While Congress presumably wishes the ordinary rules of contract law to apply in ordinary times, the Lend-Lease Act was the most potent proof that the times were far from ordinary. The inclusion of paragraph 7 in contracts such as this was an appropriate regard by the Executive for the very emergency which impelled Congress to act and to give its agencies power to act.