151 F.Supp. 469 (1957)
UNITED STATES of America, Plaintiff,
v.
J. D. STREETT & CO., Inc., a corporation, Defendant.
No. 8928(2).
United States District Court E. D. Missouri, E. D.
April 10, 1957.
*470 Robert E. Brauer, Asst. U. S. Atty., St. Louis, Mo., for plaintiff.
George C. Dyer, and Ray T. Dreher, St. Louis, Mo., for defendant.
HARPER, District Judge.
The United States instituted this suit to recover the sum of $25,000, a sum equal to the amount paid by the defendant to one James A. Waechter, an attorney employed by the defendant to help acquire from the plaintiff certain real estate, being war surplus property. The action is based upon the defendant's alleged breach of one of the provisions of the contract of sale. The contract of sale contained a provision, as follows:
"Covenant Against Contingent Fees: The successful bidder warrants that he has not employed any person to solicit or secure this contract upon any agreement for a commission, percentage, brokerage or contingent fee. Breach of this warrant shall give the government the right to annul the contract or at its option to recover from the successful bidder the amount of such commission herewith set forth. This warranty shall not apply to commissions payable by the successful bidder upon the contract secured or made through bona fide established commercial agencies maintained by the successful bidder for the purpose of doing business. `Bona fide established commercial agencies' has been construed to include licensed real estate brokers engaged in the business generally."
The evidence shows that the defendant submitted two bids, one to purchase the improvement located on the real estate, as to which bids were solicited, and the other to lease the real estate for a period of ten years with certain options. These bids were rejected by the government by letter of August 29, 1949, which letter stated the terms for which it would dispose of the property, and which terms were agreed to by the defendant by letter dated August 31, 1949. On September 9, 1949, there was an award in favor of the defendant in accordance with its bid, and on November 1, 1949, the United States executed a quit claim deed and bill of sale of said war surplus property.
The testimony of Kenneth C. Baker, president of the defendant company, discloses that since 1947 the defendant company had been trying to purchase some industrial property upon which to build a plant, and that it became interested in the property in question in 1949. The defendant company entered into a contract with the DuPont Company in September of 1949, which contract was to become effective upon the completion of the plant which was to be built on the property in question. The property in question first came to the attention of the defendant company when Baker was told about the property by a Jack Rogers of Joseph Darst & Associates, a St. Louis real estate firm who had been trying to locate a suitable piece of property for the company. Rogers advised Baker that the property was held by the War Surplus & Assets Administration, whose headquarters for the area was in Kansas City, Missouri. Rogers and Baker went to Kansas City about the middle of April, 1949, to find out if it would be possible to purchase the property, and upon what basis. They were advised by a W. R. Smith, who was handling the property for the War Surplus & Assets Administration, that the Organized Reserve occupied a part of the property, but was going to relinquish the property and turn it over to the War Assets Administration shortlyas soon as they got certain property they had out of one of the buildings, at which time it was anticipated the complete property would be in their hands, but until that occurred only part of it was available for sale. Smith, at that time, advised Baker and Rogers that the asking price *471 of the property in which the defendant company was interested would be approximately $117,000.
Subsequently, much difficulty was encountered by the defendant company in acquiring the property, in that the Organized Reserve was slow in vacating the property, and Baker was becoming rather discouraged about the slowness of action. He discussed the matter with George Murch, of the Murch Contracting Company, whose company was going to handle the reconstruction of the facilities of the property after the property was acquired by the defendant, and who, like Baker, was very anxious to expedite the matter. Murch suggested that one Lee Schumacher, who made frequent trips to Washington, be contacted, and that Schumacher be asked to make inquiry in Washington to see if the matter could be expedited. Based upon Murch's recommendation, Baker contacted Schumacher, who agreed to inquire in Washington to see if the matter could be expedited. On or about June 10, 1949, at Baker's office, Schumacher informed Baker that he had inquired into the matter in Washington, but was reluctant to state with whom he had talked. Schumacher informed Baker that the property could never be acquired by the defendant until a certain attorney was hired, that attorney being one James A. Waechter, and that his fee would be $25,000.
Baker was not acquainted with Waechter, but decided to hire him, and at this meeting the defendant company's check for $25,000 was prepared, payable to Waechter, and delivered to Schumacher with instructions that he (Schumacher) was to hold the check until directed to release it to Waechter, to which Schumacher agreed. As far as the defendant company was concerned, unless the property was obtained by November 1, 1949, the property was valueless to the defendant company. Baker had no contact with Waechter prior to approximately September 26, 1949, when he met Waechter for the first time at a luncheon meeting attended by Baker, Waechter and Schumacher, at the Racquet Club in St. Louis. Baker had not seen Schumacher between the period of June 10 and September 26, 1949. A few days prior to the September 26th meeting Baker had authorized Schumacher to turn the $25,000 check over to Waechter, since he had been informed on September 9th by the General Services Administration that, subject to providing a legal survey, the defendant company's bid had been accepted. At this September luncheon, Waechter asked Baker for a letter stating that his services had been satisfactory, which letter was given.
The testimony of Schumacher indicates that Waechter stated if the matter could not be handled by November 1st, that he didn't want the defendant company's money and the check would be returned. The testimony before the court established the payment of a contingent fee for services under the employment contract by the defendant and Waechter. The evidence conclusively shows that defendant through its president, Baker, did employ Waechter, through Schumacher, on or about June 10, 1949, to expedite its acquiring the property in question in time to effect a contract with DuPont. Schumacher, according to Baker, was to employ Waechter, but he was instructed to hold the $25,000 check until Baker released its delivery to Waechter. Waechter stated that if the job couldn't be done he didn't want any of the money. Baker authorized delivery of the check after the defendant company had been notified of the government's acceptance of its bid for the property.
It is readily apparent that defendant's intent was to compensate Waechter if the property were acquired within the allotted time. The check was not deposited to Waechter's account until September 27, 1949, seventeen days after the defendant company had been notified that its bid had been accepted. Waechter was employed to solicit or to secure the contract in question. He was not hired until after Baker had been informed that the defendant company could not acquire the property until Waechter was hired. The testimony discloses that Waechter *472 made inquiry in Washington from time to time with respect to the property. The letter given by Baker to Waechter states: "We want you to know how much we appreciate the assistance and guidance given us by you while procuring this property." The only reasonable conclusion that may be drawn from the evidence is that Waechter was employed by the defendant on a contingent fee basis to solicit or secure the contract in question.
The provision in the contract, prohibiting contingent fee contracts and giving the government the right to recover an amount equal to such fee, is a provision for liquidated damages. The general principle with regard to liquidated damage is set forth in Restatement, Contracts, Sec. 339, as follows:
"(1) An agreement, made in advance of breach, fixing damages therefor, is not enforceable as a contract, and does not affect the damages recoverable for the breach, unless
"(a) The amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach, and
"(b) the harm that is caused by the breach is one that is incapable or very difficult of accurate estimation."
The majority of the Supreme Court in Priebe & Sons, Inc., v. United States, 1947, 332 U.S. 407, 68 S.Ct. 123, 92 L.Ed. 32, cited the Restatement of Contracts above quoted with approval and observed that liquidated damages provisions "serve a particularly useful function when damages are uncertain in nature or amount or are unmeasurable, as is the case in many government contracts." 332 U.S. at page 411, 68 S.Ct. at page 126. The court further observed that liquidated damage "provisions are to be judged as of the time of making the contract." 332 U.S. at page 412, 68 S.Ct. at page 126, citing United States v. Bethlehem Steel Co., 205 U.S. 105, 27 S.Ct. 450, 51 L.Ed. 731. Although it is clear that a finding that a provision is one for liquidated damages requires that damages could be anticipated at the time of execution of the contract, whether actual damage did or did not occur or was not proved to have occurred does not prevent recovery. United States v. Bethlehem Steel Co., supra, 205 U.S. 119, 27 S.Ct. 455, United States v. LeRoy Dyal, Inc., 3 Cir., 186 F.2d 460, 462.
The initial question before this court is whether the provision in question was a liquidated damages provision or a penalty; whether the government could have anticipated at the time of execution of the contract that future damages or financial loss might accrue as a result of a breach of contract. Mr. Justice Holmes in Hazelton v. Sheckels, 202 U.S. 71, 26 S.Ct. 567, 568, 50 L.Ed. 939, commented upon contingent fee contracts as follows:
"The objection to them rests in their tendency, not in what was done in the particular case. Therefore a court will not be governed by the technical argument that when the offer became binding, it was cut down to what was done, and was harmless. The court will not inquire what was done. If that should be improper, it probably would be hidden, and would not appear. In its inception, the offer, however intended, necessarily invited and tended to induce improper solicitations, and it intensified the inducement by the contingency of the reward."
While the subject of liquidated damages is not discussed in this case, it is a reasonable inference that improper solicitations included by a contingent fee contract would in many instances result in pecuniary loss to the government.
In United States v. Paddock, 5 Cir., 178 F.2d 394, rehearing denied 180 F.2d 121, the court at page 123 said:
"Conceding that the warranty was breached, a question is presented as *473 to whether the claim is for liquidated damages or for a penalty. We think the purpose of this warranty was not to penalize contractors, but to protect the government from financial loss. The practice of paying contingent fees to secure government contracts was a well-known evil, which was costing the government large sums of money, when Executive Order No. 9001, 50 U.S. C.A.Appendix, § 611 note, was promulgated. It was against public policy, but the amount of the damages was hard to prove, which accounts for the stipulation in the warranty that the amount of the contingent fee should be the measure of damages."
In the Paddock case the government filed claims against the estate of the Globe Aircraft Corp., bankrupt, for a contingent fee paid by the Globe Aircraft Corp., to a third party as commissions for procurement of government contracts. These government contracts all contained warranties, as authorized by Executive Order No. 9001, 50 U.S. C.A.Appendix, § 611 note. This order reads as follows, 178 F.2d loc. cit. 395:
"Every contract entered into pursuant to this order shall contain a warranty by the contractor in substantially the following terms:
"The contractor warrants that he has not employed any person to solicit or secure this contract upon any agreement for a commission, percentage, brokerage, or contingent fee. Breach of this warranty shall give the Government the right to annul the contract, or, in its discretion, to deduct from the contract price or consideration the amount of such commission, percentage, brokerage, or contingent fees. This warranty shall not apply to commissions payable by contractors upon contracts or sales secured or made through bona fide established commercial or selling agencies maintained by the contractor for the purpose of securing business."
The trustee in bankruptcy contended the provision for deducting from the contract price the amount of such commission, brokerage, or contingent fee was a provision for a penalty within the meaning of Section 57, sub. j of the Bankruptcy Act, 11 U.S.C.A. § 93. The Referee and District Court agreed with the trustee but the Court of Appeals reversed and stated, 178 F.2d loc. cit. 396:
"This clause of the warranty merely provides a method of computing the liquidated damages to the Government resulting from the breach."
A further aspect of this question, as to whether damages could be anticipated at the time of execution of the contract, is whether any distinction should be drawn between a government contract to purchase and a government contract to sell. Defendant states in his Brief, p. 38, that it clearly appears that the Paddock case presents at least a factual basis for the predetermination of actual damages to be sustained by the government in the event of a breach by the other contracting, whereas in the present action by the government no facts even remotely similar can be found.
Defendant continues at p. 39: "The damages reasonably anticipated by the plaintiff at the time of the execution of that contract were based on the probability that if the defendant breached the warranty therein contained, the amount by which it breached such warranty would be passed on to the government. Whether the amount of the contingent fees paid by the defendant actually were passed on to the government becomes unimportant * * *."
Defendant's position is that the government could not have anticipated at the time of execution of the contract that future damages or financial loss would accrue as a result of a breach of this contract. Defendant points out that the pertinent procedural regulations in force when the contract under consideration was entered into provided that the property sought to be purchased by the defendant *474 be appraised by the government-seller and that the sale be open to competitive bids. Yet, this is also generally the case in government contracts of purchase. Defendant urges that the uncontradicted evidence clearly establishes that in the middle of April, 1949, J. D. Streett & Company had been advised by the plaintiff that the amount of money required to be paid for the property and improvements in question was $117,000, and that this valuation had been pre-determined by the government itself. Though the contract of purchase had not been formalized by the execution of both parties at this time when the agreement was completed, the improvements and property were sold for the amount set by the government. Defendant then argues that at the time of execution financial damage in any amount in the light of these circumstances could not be envisioned by the parties as a result of the breach of warranty; that no damages in fact could result to the government as the government received all the consideration it demanded.
But the element of profit to the buyer of property from the government is equally present as it is to the seller of property to the government. The government can sustain a loss in realizing too little from the sale of its property as well as sustain a loss in paying too much for property it purchases. While it is true in one respect that the government received all the consideration it demanded, yet there is a tendency that in contracts of this kind governmental officials might be subject to improper solicitations to demand a figure or make an appraisal below a reasonable sales price. While, as defendant states, there is no evidence of this character, it is unnecessary for this court to inquire as to what was done. To again quote Justice Holmes in Hazelton v. Sheckels, supra, 202 U.S. loc. cit. 79, 26 S.Ct. loc. cit. 568, he said:
"If that [the offer] should be improper, it probably would be hidden, and would not appear."
In answer to defendant's objection that there is no relationship between any anticipated damages and stipulated damages, it may be said that the amount paid by the purchaser as a contingent fee in violation of the terms of the contract would be a reasonable measure of damages which the government would sustain, since absent the payment of the contingent fee, the government might expect to receive at least that much more. If defendant were willing to pay $117,000 for the property plus $25,000 as a contingent fee to obtain the same, then defendant surely would be willing to pay at least $142,000 for the property absent the need to pay $25,000 as a contingent fee. As in a government contract to purchase, a contingent fee in a government contract to sell is an integral part of the price of the property. Nor is it necessary to consider whether actual damage has or has not been shown. Rex Trailer Co., Inc., v. United States, 350 U.S. 148, 76 S.Ct. 219, 100 L.Ed. 149; Priebe & Sons, Inc., v. United States, supra; United States v. Bethlehem Steel Co., supra; United States v. Leroy Dyal, Inc., supra.
If defendant's argument that damages could not result to the government by contingent fee contracts wherein the government is seller, as the government receives all it demands, is a sound one, then it might be said with equal force that damages could not result to the government as purchaser where, as is usually the case, contingent fee contracts for the procurement of government contracts are actually secured through competitive bidding. Yet the courts have recognized that contingent fee contracts were costing the government large sums of money.
In conclusion, on this point the government could reasonably anticipate damages at the time of execution of the contract, and that the provision for recovery of an amount equal to the contingent fee is a reasonable forecast of just compensation. As such, the provision is clearly *475 a provision for liquidated damages and not for a penalty.
Having determined that the fee was a contingent one and the provision in the contract in question is one for liquidated damages and not a penalty, we turn to the question of whether there was a public law existing at the time of the execution of this contract authorizing the government to insert in the provision of this contract the provision in question.
On December 18, 1941, Congress passed the First War Powers Act, 1941, 55 Stat. 838, Title 50 U.S.C.A.Appendix, § 601 et seq. Section 201 of the Act, Sec. 611, Title 50 U.S.C.A.Appendix, provides:
"The President may authorize any department or agency of the Government exercising functions in connection with the national defense, in accordance with regulations prescribed by the President for the protection of the interests of the Government, to enter into contracts and into amendments or modifications of contracts heretofore or hereafter made * * *."
On December 27, 1941, Executive Order 9001, 6 F.R. 6787, was promulgated. By it, the President authorized the Department of the Army, Navy Department and Maritime Commission to enter into contracts and prescribed regulations within which said contracts were to be executed. It read, in pertinent parts, as follows:
"5. Every contract entered into pursuant to this order shall contain a warranty by the contractor in substantially the following terms:
"The contractor warrants that he has not employed any person to solicit or secure this contract upon any agreement for a commission, percentage, brokerage, or contingent fee. Breach of this warranty shall give the Government the right to annul the contract, or, in its discretion, to deduct from the contract price or consideration the amount of such commission, percentage, brokerage, or contingent fees * * *."
Thereafter, on February 7, 1945, the President again by authority of the First War Powers Act issued Executive Order No. 9519, 50 U.S.C.A.Appendix, § 611 note, wherein Executive Order No. 9001 was extended to apply to the office of the Surplus Property Board. The preamble to this Executive Order states:
"By virtue of the authority vested in me by Title II of the First War Powers Act, 1941, approved December 18, 1941 (55 Stat. 839), and as President of the United States, and deeming that such action will facilitate the prosecution of the war, I hereby extend the provisions of Executive Order No. 9001 of December 27, 1941, to the * * * Surplus Property Board * * *, with respect to all contracts made or to be made by such agencies."
The Surplus Property Board had previously been created by the Surplus Property Act of 1944, 58 Stat. 765. Section 2 of the Act declares the objectives of it to be to facilitate and regulate the orderly disposal of surplus property. Section 6 of the Act gave the Board general supervision over the disposition of surplus property.
The Surplus Property Board was later abolished, and the Surplus Property Administration created, to be headed by a Surplus Property Administrator, to whom the functions of the Surplus Property Board were transferred. Later, the Surplus Property Administration became known as the War Assets Administration, and still later the powers and functions of the War Assets Administration, with regard to surplus real property, were transferred to the Reconstruction Finance Corporation. Then, on June 30, 1949, 63 Stat. 377, the General Services Administration was created and by Section 105 of the Act transferred the functions of the War Assets Administration to the General Services Administration, *476 5 U.S.C.A. § 630c. The General Services Administration was then given the power to dispose of surplus property, within the regulations promulgated by the President pursuant to authority given him in the First War Powers Act, 1941.
Defendant argues that Executive Order No. 9001 refers exclusively to contracts to supply the government with goods and materials, and not to contracts of purchase of government property. Defendant further reasons that Executive Order No. 9519 extending the provisions of Executive Order No. 9001 to apply to the Surplus Property Board has no special significance other than the fact that the same type of purchase contracts, not sale contracts, entered into by such agency would also be subject to the same limitations based on the same authority. But defendant's argument ignores the fact that the primary function of the Surplus Property Board was the disposal of surplus property. Further, Executive Order No. 9001 refers to every contract entered into pursuant to its terms. This Order further provides for a warranty not in precise terms, but as the Order states, "in substantially the following terms." The substance of these terms provides for damages equal to the amount of a contingent fee paid in breach of the warranty. The provision for deducting the amount of the contingent fee from the contract price is a provision not of substance but of form adaptable to purchase contracts. If there be further doubt it is dispelled by Executive Order No. 9519 which extends the provision of Executive Order No. 9001 to the Surplus Property Board "with respect to all contracts made or to be made by such agencies" without limitation to contracts relating to purchase.
Such regulations made pursuant to Congressional authorization have the force and effect of statutes, Priebe & Sons, Inc., v. United States, supra.
Judgment will accordingly be for the plaintiff in the sum of $25,000. Attorney for the plaintiff will prepare findings of fact, conclusions of law and judgment to be entered by the court.