In re D. FEDERICO COMPANY, INC., Debtor.

D. FEDERICO COMPANY, INC. and United States Fidelity and Guaranty Company, Plaintiffs,

v.

NEW BEDFORD REDEVELOPMENT AUTHORITY and the City of New Bedford, Defendants.

Bankruptcy No. 79–2289–HL. Adv. No. A80–0619.

United States Bankruptcy Court, D. Massachusetts.

Nov. 23, 1982.

Edward Kutchin, Kline & Gordon, Boston, Mass., for plaintiffs, debtor and U.S. Fidelity and Guar. Co.

Raymond A. Letourneau, New Bedford, Mass., for defendants New Bedford Redevelopment Authority and City of New Bedford.

## FINDINGS AND RULINGS ON DAMAGES

HAROLD LAVIEN, Bankruptcy Judge.

This proceeding centers around a construction contract entered into between the plaintiff, D. Federico Company, Inc. ("Federico"), and the defendant, New Bedford Redevelopment Authority ("Authority"). Jurisdiction is based on 28 U.S.C. § 1471, an Order for Relief on behalf of the D. Federico Company, Inc. having been entered on September 18, 1980. The plaintiff, United States Fidelity and Guaranty Company ("U.S.F.G.") is the surety on the payment and performance bonds naming the Authority as obligee and Federico as principal. It is uncontested that U.S.F.G., by virtue of its obligations under the bonds, has expended monies to complete the project. U.S. F.G. bases its standing on its right of equitable subrogation and its status as assignee of all Federico's contract balances and claims. The defendant, City of New Bedford, has assumed the liabilities of the Authority in connection with the contract in issue by virtue of a Closeout Agreement executed by and between the Department of Housing and Urban Development and the Authority.

The plaintiff, Federico, a general contractor, held five public contracts with the defendant, Authority, as part of a substantial urban renewal program in the City of New Bedford. At issue in this case is Contract No. 5 of the South Terminal Urban Renewal Project, a contract for the reconstruction of the two earth-filled bulkhead piers, Homer's Wharf and Leonard's Wharf.

By agreement, the trial was bifurcated. The Court issued its opinion on liability in December of 1981.[1] The damages trial began in April of 1982 after some preliminary hearings, and the trial was completed in July of 1982, with seven days of evidence in total.

On April 5, 1982, the parties stipulated to the retainages on the following items in the following amounts:

| | | |
|---|---|---|
| 1) | TOTAL RETAINAGE DUE AFTER APPROVAL OF ESTIMATE NO. 53 | $160,064.53 |
| 2) | RETAINAGE WITHHELD ON CHANGE ORDERS 2 & 3 | 31,587.11 |
| 3) | AMOUNT OF ESTIMATE NO. 53 | 17,610.68 |
| 4) | AMOUNT DUE LINE ITEM 33 SITE PREPARATION | 43,095.00 |
| 5) | AMOUNT DUE LINE ITEM 31 FIELD OFFICE | 100.00 |
| | TOTAL BEING WITHHELD BY THE AUTHORITY | $252,457.52 |

In addition to these amounts, the Court had determined in the liability section that $140,000 was due the plaintiff on line item 34, traffic and maintenance, and that the Authority was entitled to a credit of $1,552.26 for overpayments on Change Orders No. 2 and 3. The final total of $390,905.26 was subject to any additional amount of damages awarded to the contractor and any offsets that the Authority might be entitled to under its counterclaim as previ-

---

1. *D. Federico Company, Inc. v. New Bedford Redevelopment,* 16 B.R. 282 (Bkrtcy.D.Mass. 1981).

ously ruled on in the Court's December 29, 1981 Memorandum. The parties further agreed that to the extent it was necessary, Ex. FD1 gave the varying interest rates under Mass.Gen.Laws ch. 30 § 39G.

On May 17, 1982, well after the Court had made its findings in the liability trial, which defined and limited the issues to be heard in the damages trial; after several pre-trial hearings and after the trial on damages had begun, the Authority sought for the first time to amend its counterclaim and challenge eight line items in Ex. 6, Estimate No. 53, the Authority's semi-final estimate of January, 1979. The Court denied the Authority's motion to amend its counterclaim not only because at this belated date the trial had already commenced, but also on the theory that the parties had stipulated to the accuracy of the Authority's semi-final estimate and that the plaintiff's trial preparation had been completed on the basis that the issues open had been defined in the liability findings based on the Authority's then set of counterclaims. *Vargas v. McNamara*, 608 F.2d 15 (1st Cir.1979); *Johnston v. Holiday Inns, Inc.*, 595 F.2d 890 (1st Cir.1979); *Span East Airlines v. Digital Equipment Corp.*, 486 F.Supp. 831 (D.Mass. 1980). Therefore, the defendants were not allowed to offer evidence in conflict with the semi-final estimate.

RAYMOND CONCRETE PILE EXCAVATIONS

On the issue of the excavations, two things must be said before any consideration of the evidence on damages. First, we are dealing with an issue where neither party is entitled to be totally vindicated. The Court determined in the liability trial that the Authority had information that would have been helpful to the bidders, which disclosed in more detail the composition of the collapsed pier and therefore revealed the material which was likely to be encountered in the required excavation. On the other hand, the Court also found that had the contractor made a reasonably thorough low tide visual examination of the remains of the collapsed portion of the pier and its environs, the contractor would have observed everything that was in fact encountered in excavation including the likely existence of Raymond concrete piles. Second, the contractor's bid made it clear that its examination might charitably be called superficial and it was in fact unaware of the Raymond concrete piles though even on its superficial examination, it was or should have been aware of everything else. Therefore, the only reason for not holding the contractor to its bid is that it would result in an unwarranted benefit to the Authority. The Authority was accordingly required to pay for the removal of the Raymond concrete piles that it would have been charged for had the *Goodkind & O'Dea Engineering Report (Report)* been made available.

As a matter of equity and in the context of this case where each party acted imprudently, I originally concluded that an appropriate measure of damages would be the reasonable bid that would have been made to remove the Raymond concrete piles.

Evidence has been presented of what a knowledgeable contractor might bid ranging from the Authority's expert's bid of $11.25 per cubic yard, to the plaintiff's engineer's bid of $43.58 per cubic yard through four more figures of the plaintiff's expert based on various assumptions resulting in bids of $54.53, $63.52, $89.81, to finally $292 per cubic yard. Everybody's proposed bid was then analyzed and cross-examined in depth so that there was laid bare all of the basic assumptions as to the cubic yards that had to be dealt with, the contemplated daily amount of cubic yards removable under different assumptions, the various equipment and personnel necessary and the selective hindsight being used. All of the bids reflected an air of complete unreality in either grandiose labor cadres or totally inadequate personnel. Each side in its cross-examination effectively demonstrated the lack of reality surrounding the estimates and the flaws in the underlying concepts. Probably as a result of a lack of clarity on my part, the plaintiff's estimates seemed to assume a total lack of the competitive bidding process allowing the building in of any and all

potential costs including direct and indirect overhead and profit. The point may best be illustrated by the plaintiff's expert's answer to the Court's question as to pencil sharpening in competitive bidding in the real world when he stated he doesn't shave any bids to be competitive. He does not try to beat other bidding contractors.[1A] On the other hand, the Authority's expert had no real experience in this type of underwater excavation and his calculations were based on a book entitled "1974 Dodge Manual for Building Construction Pricing and Scheduling", which is not designed for marine or heavy construction.

If bids are going to be based on such intangibles as bidding psychology, how much at any given time a contractor desires the work and ideal reconstructions of hypothetical situations, which ignore the available actual costs even as possible check points, then different measurements must be resorted to by the Court in striking a fair balance between the parties in this case.

The parties must bear in mind that we are not starting at the actual bidding date in 1974. The Court has already, after a lengthy trial, determined that the plaintiff's problem could have been avoided but for its own imprudence and it would be forced to live with its original bid but for the Authority playing its own disclosures a little too close to the vest.

Neither party should expect to profit from the tangled events, but neither should be required to bear the full cost.

I am therefore forced to conclude that trying to reconstruct the hypothetical bidder is not likely to produce the desired equitable result but rather a variant is appropriate. That variant is what would be the fair and reasonable competitive charge for removing the Raymond concrete piles and anything so inexorably entwined or attached so as to have become a part of the piles, while recognizing that in the liability findings all of the other material was found to be covered by the contract bid price.

Fortunately, the trial ranged widely and included ample evidence for the Court to determine both the number of cubic yards involved and a cost per cubic yard which can be further supported by evidence of the actual cost.

In determining a fair and reasonable unit price for the added work of excavating the Raymond concrete piles and anything so enmeshed therewith as to essentially be an integral part of the piles I cannot accept any of the plaintiff's bids, not only for the reasons already mentioned, but because they all in one way or another recognize but do not really discount for the fact that the excavation work, whether easy or difficult, will involve not only the piles but all the other excavation material for which no additional compensation is appropriate. In this regard, the testimony of Steven Cassidy, the diver employed at different times by both Federico and the Authority, quoted in plaintiff's brief on page 8, indicates that some of the material which Federico's bid covered was no less a problem than the piles.[2]

---

**1A.** THE COURT: "... then don't you have leeway in your competitive bidding because there are competitors out there whose price you have to match, to shave your price somewhat?

THE WITNESS: I don't think so.

THE COURT: If not, you are the most unique businessman I have ever met.

THE WITNESS: When we bid a job we are trying to determine at all times what is the cost of the job. We are not saying that we have to beat contractors X and Z."

Transcript: June 30, 1982, p. 11

**2.** BY MR. LETOURNEAU:

Q. Were the pieces all separate?

A. They were in close contact with each other, and they were buried in a mixture of fill. It was sort of like a a game of pick up sticks. They were not generally connected to each other. Once you exposed one you could get onto it and pick it, or try to pick it, and just keep at it until you got it or exposed another one.

THE COURT: You keep talking about "it" and "one". What are you referring to when you talk about "it" and "one"?

THE WITNESS: Boulders, Raymond concrete pile, dimension stone, all of the solids that were intermingled in there, in the fill. Any-

The original bid documents estimate 3000 cubic yards as the probable excavation for which Federico bid $10 per cubic yard and although his overall bid was the lowest competitive bid, his bid on this item was the highest, the others being $3.50, $6 and $7 per cubic yard. Of course, if $10 was expected to be profitable for 3000 cubic yards, it should have been even more profitable when approximately 60,000 cubic yards was actually removed and paid for. The plaintiff is not entitled to recover for the unexpected difficulties excluding the piles which the plaintiff should have known about. Mr. Kassap made an estimate based on removing 3000 cubic yards of material of which 1060 cubic yards would be concrete. On those figures, his bid would have been $89.81 per cubic yard. This bid, I find, would be the closest to what a contractor making a reasonable competitive bid would bid to remove Raymond concrete piles. However, even this bid is probably low because it assumes that there are 1940 yards of common excavation on which the contractor anticipates a profit. All of the equipment used would be adequate to remove the Raymond concrete piles, therefore, by increasing this bid somewhat to compensate for a decreased production rate when all that is being removed is Raymond concrete piles, I would find that $100 per cubic yard would be a fair and reasonable competitive price for the removal of just Raymond concrete piles including anything that had become enmeshed so as to, for all practical purposes, be a part thereof.

Having determined the rate, it is next necessary to determine the number of cubic yards of Raymond concrete piles and integrated material. As a starting point, it is clear that there must be an outside limit to the number of piles involved since there is unlikely to be a fertility factor; there cannot be more piles than were originally in the collapsed portion of the pier.

Three experts testified as to how many cubic yards of Raymond concrete pile would have been in the collapsed area basing their testimony on the information in the *Report* and on the plans. Robert Noyer, formerly the resident engineer for the NBRA, who was let go prior to the completion of the project which might give him some animus toward the Authority, was one of the plaintiff's experts. The plaintiff in its brief asks the Court to give great weight to Noyer's testimony. He estimated that the perimeter of the old pier was approximately 520 lineal feet. Since a Raymond concrete pile is two feet in width, he estimated that there would have been 260 Raymond concrete piles in total around the perimeter. Mr. Noyer estimated that each pile was about two cubic yards in volume, therefore, his estimate was that there would have been 520 cubic yards of Raymond concrete pile around the perimeter. Although I would accept his estimate as to the number of piles, the NBRA's expert, Steven MacCaffrie, testified that a Raymond concrete pile, one foot by two feet by 45 feet, would be 3.33 cubic yards in volume. MacCaffrie further testified that from the plans, he determined that there were 275 Raymond concrete piles around the perimeter. Two hundred seventy five (275) Raymond concrete piles times 3.33 cubic yards per pile equals 915.75 cubic yards of Raymond concrete piles. MacCaffrie did not calculate volume for any horizontal piles across the width of the pier although there was testimony that such piles did exist. There was no evidence of any horizontal piles being excavated and their dimension, according to Noyer, was considerably smaller, 6 to 8 feet or one-half a cubic

thing that couldn't be bucketed out, your Honor.

\* \* \* \* \* \*

THE COURT: I have just one question. All of this material that you have mentioned as being the most difficult or the largest—you did not mention any Raymond concrete piles. Do I take it in your view they were not a particular problem?

THE WITNESS: No, I wouldn't say that, your Honor. It was all a problem, as far as I was concerned.

THE COURT: The Raymond piles were either no more or no less a problem than anything else?

THE WITNESS: I would say there was equal difficulty or near equal difficulty.

Transcript: June 30, 1982, pgs. 21, 22, 24 & 25.

yard. David Kassap, Federico's expert, determined that there was 550 lineal feet around the perimeter which he counted as 329 concrete sheet piles which he stated would be equal to 1,375 cubic yards, based on 4.62 cubic yards per pile. Kassap based his cubic yard determination on a Raymond concrete pile which was 20 inches by 20 inches. I accept and find that the piles were 45′ × 1′ × 2′ constituting 3.33 cubic yards per pile and 6 to 8 feet for the horizontals, constituting ½ cubic yard per pile. Mr. Noyer, who was probably most adverse to the NBRA, testified that there was approximately 520 cubic yards of Raymond concrete pile. However, I find that he probably used too low a figure for his determination of cubic yards per pile. Taking MacCaffrie's calculation of 3.33 cubic yards per pile and applying it to Mr. Noyer's 260 piles, one comes up with 865.80 cubic yards around the perimeter. There was no specific evidence as to the likely number of horizontal piles and, in fact, there was evidence that they were just a circumferential edging but in any event, considering their size and their maximum single location as compared to the three sides of the pier covered by vertical piles, a figure should be added of one-third to cover the piles along the horizontal width of the pier. Additionally, giving the debtor the benefit of the doubt, another third should be added to cover the problem of excavating concrete or other debris joined or entangled or the broken, twisted metal entangled with the concrete piles which although the *Report* would not have revealed this material, it was inseparable from the piles. Therefore, I find that there was a total of 1,443 cubic yards of actual integrated Raymond concrete pile excavated. Based on the findings that $100 per cubic yard would be a fair and reasonable competitive bid and that 1,443 cubic yards of Raymond concrete piles were removed, the plaintiff is entitled to $144,300 for this work, less a credit of $10 per cubic yard which was the contract price already paid, for a total of $129,870 due Federico from the Authority on Counts I and II.

This finding of damages was reached independent of any attempt to determine actual costs, but having made my finding and in the light of the vigorously contested positions of the parties, I re-examined my notes, the transcript, exhibits and briefs and note that the evidence of actual costs lend support to my conclusions. John Capacefalo, Federico's engineer, determined in 1977 that the actual additional expense to excavate the unanticipated obstructions was $160,336 which included a 15% profit calculation, for an actual cost of $139,423 which includes indirect costs. This evidence was presented through a letter dated July 11, 1977, ex. P. 42. Capacefalo testified that he prepared the letter to present to the NBRA to show the additional expenses Federico had incurred in removing the obstructions.

Finally, some of the difficult obstructions including some of the piles were removed by the Salah & Pecci heavy equipment which removed approximately 5,000 cubic yards from August 27, 1976 through November 20, 1976 at a cost of $36,414.94 which included equipment rental and 33.6% indirect labor costs. Ex. FD29. If we accept plaintiff's claim that out of the approximately 60,000 cubic yards of excavation, 20,000 cubic yards should be attributed to the difficult and unexpected, and we multiply the Salah & Pecci cost by four, assuming their heavy equipment was brought in for all the difficult work, that would total $145,659.76, assuming it were all considered extra work with no offsets for the portion of the work that was paid for under the contract, namely, $20,000.

LOWERING WALES

■ On this pier, there would appear to be no simple adjustments. It should be easy to determine the extra cost of moving 260 linear feet of wales from a level of .5 to –3. Once the contractor meets its burden of showing the cost which it does by a well documented daily log showing a cost of $40,316.46, it merely must give the Authority a credit for having been allowed to install 2,100 feet of wale at .5 instead of –3, as the specifications and the bid required. The only thing the parties agree to is that the installation at .5 would save time pre-

sumably because less work would have to be done under water. The contractor insisted the savings were minimal, involving a diver and a pump and amounting to a maximum of $6,000. That minimized explanation strains credulity, particularly with the unexplained fact that Federico, shortly after it had been awarded the contract to attach the wales at –3, signed a sub-contract with Hub Foundation to install the wales at –1, a depth never the subject of any agreement with the Authority. Federico, on cross-examination, could offer no explanation but Francis Maxwell of Hub Foundation gives us a clue when he testified that it would cost twice as much to install the wales at –3 as it would at –1. If it would involve that much of a differential to go from –3 to –1, there would be at least that much of a saving in going even further out of the water, e.g., to .5. Whether Federico in fact received a credit from Hub Foundation for going from –1 to .5 is a separate issue to which the Authority is not a party. I find that Federico saved at least $65,000 [3] in installing all the wales at .5 over –3. Since the cost of lowering 260 feet by Federico's figures comes to $40,316.46, the offset for the savings fully compensates for any extra expense. I would also note that the Authority disputes this $40,000 figure because some of the work such as the removal of stone wall, would have had to be done if the wales were installed as originally specified at –3, and the Authority would have to be entitled to a credit.

## COAL TAR EPOXY

■ The Authority is entitled to collect damages for Federico's failure to apply coal tar epoxy to the securing bolts along Homer's and Leonard's Wharf. In the opinion on liability, I stated the damages must be based on what the cost would have been if the work was performed no later than the first six months of 1980, since I have found that the contract was substantially complet-

ed in December of 1978, and the contractors would then have a year to remedy omissions so the Authority was allowed a reasonable amount of time to perform its own remedy. Incidentally, I would note that in the testimony on damages, evidence was presented that the bolts were made of corrosion resistant material and therefore applying coal tar epoxy was probably unnecessary. Nevertheless, the Authority would still be entitled to a credit since this work was contracted for and not performed.

In January of 1979, Henry Horn, the Executive Director of the NBRA, sent the plaintiff a semi-final estimate which included a punch list of corrective work. According to that punch list, the Authority was retaining $3,500 to cover the cost to coat the tie-rod bolts with coal tar epoxy. Exhibit FD 19, a copy of the original estimate sheet prepared by Anton Brockelman, reveals that the $3,500 figure is based upon coating 330 bolts. This would come to a cost of $10.61 per bolt. The Authority now asserts through Steve Cassidy, a diver, that it will cost $28,615 to clean and coat 1,229 bolts.

Federico's expert, David Kassap, determined that it would cost $9.39 per bolt in 1979 and $9.99 per bolt in 1980. Mr. Kassap originally made his calculations based upon coating 2,106 bolts.

The burden was on the Authority to prove how many bolts were to be coated and the cost. While the Court is tempted to only award the Authority the $3,500 which Horn requested in the semi-final estimate, the plaintiff has offered no evidence to refute the Authority's assertion that 1,229 bolts need to be coated. In fact, the plaintiff offered a figure of 2,106 bolts.

There was no evidence presented that we were dealing with a deteriorating situation such that Brockelman's number of bolts would have been the number to consider. Further, there was no evidence that a bolt,

---

**3.** The amount Federico paid Hub Foundation for installing the wales. Aside from the fact that Hub Foundation, as Federico's chosen subcontractor, is probably the best expert, it should be noted that the Authority's expert, by a different analysis, came to approximately the same bottom line savings of somewhere between $71,000 to $119,737 and therefore there was no net extra cost.

once epoxied, would become unepoxied. Therefore, Cassidy's count was probably more reflective of actual conditions since he did an underwater inspection, whereas Brockelman did not.

However, on the issue of cost per bolt, I find that Steve Cassidy's estimate is overly inflated and I am persuaded that the $10.61 per bolt originally requested by the Authority is a more accurate reflection of actual damages.[4] Their figure is not considerably different from the figure offered by Mr. Kassap. Therefore, the Authority is entitled to an award of $10.61 per bolt or $13,039.69.

PATCH PLATES OVER BOLT HOLES

■ The Authority is entitled to damages for the plaintiff's failure to install nuts on 32 securing bolts along the north face of Homer's Wharf. Plaintiff's expert, David Kassap, testified that the 32 bolts served no structural purpose and therefore the best method to correct this defect would be to remove the bolts and put patch plates over the bolt holes. The patch plate would prevent any of the pier fill material from leaking out. The Authority does not dispute this method of remedying the defect, but does dispute the cost estimate made by Kassap.

Kassap estimated that it would cost $5,605.05 in 1978 and $6,109.65 in 1980. These figures include 10% for overhead and an additional 10% for profit. However, Kassap failed to include in these estimates the 40% for indirect costs which he included in those estimates where Federico was subject to be paid. Although he stated that a contractor would not add indirect costs on a small job, it hardly seems consistent that only the estimates his client might have to pay do not include these items. I would presume that indirect costs would probably be even higher on a small job because of time wasted in travel, scheduling, and set-up.

Furthermore, the Authority correctly points out that Mr. Kassap did not use the shift method in this estimate but did use it in his other estimates. The Authority concedes that while it might not be practical to use the shift method, the cost for labor should be increased by $505.92 to adequately provide for this estimate which requires the laborers to each do 17 hours of work. Although Kassap's estimated stated that this work would take 17 hours, he only provided for two laborers to do five hours worth of work but be paid for ten hours due to the tides. Federico states that the laborers are only needed for five hours of work in applying the coal tar epoxy and the laborers would not be involved in the initial 12 hour cleaning process. I find that Kassap has not included enough labor time since only one welder's helper is going to clean the area prior to welding when the accumulation of debris from outside exposure would be the greatest whereas the estimate requires two laborers to clean the patch plate after welding before applying the epoxy when the plate is brand new and the area was already cleaned once. Therefore, I would provide for two laborers working 17 hours each at Kassap's rate, which would then be doubled to account for the tides. Additionally, the damage estimates in this case are being made for the first six months of 1980, that is the period after the expiration of the warranty, and it is assumed the Authority would do the work a reasonable time thereafter. Labor costs increased by 10% from 1978 to 1980; therefore, 1980 labor costs should be a total of $556.51 ($505.92 plus 10%). Mr. Kassap's 1980 estimate before profit and overhead would be $5,605.81 ($5,049.30 plus $556.51) to which 40% for indirect costs should be added or $2,242.32, for a total of $7,848.13, plus 10% overhead of $784.81, and to that total add 10% profit of $863.29, for a total of $9,496.33. The Authority is entitled to $9,496.33 as the cost of putting the patch plates over the bolt holes.

4. In his January 1979 letter, Mr. Horn stated that if Federico did not perform the work, the Authority would exercise its rights under the contract to complete the work and charge Federico. Therefore, I would consider that the work should have been performed near the date of the letter. However, the Court need not spend much time on this issue since the per bolt estimate at the times presented in evidence are not substantially different.

## INSTALLING FOUR INCH SQUARE WASHERS

■ The Authority is entitled to damages because of Federico's failure to install 430 four inch square washers on the securing bolts which hold the sheeting to the inner wale.

The Authority argues that the only adequate remedy is for the area to be re-excavated so that the bolts can be removed and the washers put in place. The Authority's expert, Fred Hanach, estimated that the cost to put the washers in place in early 1980 would be $196,605. Both experts agree that the purpose of the washers is to increase the bearing area of the bolt so that material will not spill out between the bolt and the hole and, more importantly, the bolt will not slip through an oversized bolt hole and perhaps cause a failure.

While Mr. Hanach's approach may give the Authority full performance, the measure of damages can be only the reasonable cost of completing the contract and repairing the plaintiff's defective performance. *See Louise Caroline Nursing Home, Inc. v. Dix Construction Corp.,* 362 Mass. 306, 311, 285 N.E.2d 904 (1972). Further, I find merit in Mr. Kassap, Federico's expert's opinion that the extensive excavation would cause damage to the entire structure since the tie-rods are on six foot centers. With that statement, even a layman, who has observed an excavating crane in operation, could agree.

Mr. Kassap testified that the defect could be repaired by installing a slotted, beveled washer behind the head of each bolt, driving it down and sealing it off with epoxy. Kassap stated that he had used this approach in other situations and that it had worked. When the Court questioned him as to whether the slotted washers would be fully as good as if it had been done properly in the first place, Kassap replied that it would be 99% as effective.

Mr. Kassap has submitted an estimate which states that it would cost $21,845.69 to install the slotted washers in 1980. The Authority disputes Mr. Kassap's labor estimates because only one bolt can be done at a time where Mr. Kassap has made his estimates based on different tasks being done at different rates of bolts per hour. For example, Mr. Kassap states that the bolts can be loosened at the rate of ten per hour and tightened at the rate of 20 per hour. However, Mr. Kassap stated that his estimate is based upon doing one bolt at a time. Further, his estimate is based upon shifts when the laborers only work four hours but get paid for eight. The Authority argues that all production has to be limited to the slowest rate, i.e., ten bolts per hour. However, using Mr. Kassap's figures, I would find that he has allotted enough labor time to complete the job. Mr. Kassap's estimate states that the work can be done at the following rates: loosen 10 bolts per hour, place 50 washers per hour, tighten 20 bolts per hour and epoxy 40 bolts per hour. These figures translate to the following production schedule: one hour to loosen 10 bolts, one-fifth hour to place 10 washers, one-half hour to tighten 10 bolts and one-quarter hour to epoxy 10 bolts. In total, it should take 1.95 or almost two hours to complete 10 bolts. Since there are 430 bolts, the entire process should take about 86 hours. Mr. Kassap has allotted 24 shifts at four hours a shift or 96 hours to do the job. Therefore, I find that enough labor time has been allowed in order to complete the job. However, again Mr. Kassap has not included any amount for indirect costs although he included a 40% factor in his excavation estimates. Taking Mr. Kassap's estimate and adding in an additional 40% for indirect costs would increase the cost of installing the washers to $30,583.97.[5] To this figure, I find that an additional 10% should be added to compensate the Authori-

---

5. 

| | | |
|---|---|---|
| Labor | | $13,424.29 |
| Material | | 2,930.00 |
| Equipment | | 1,700.00 |

| | |
|---|---|
| Sub-total Direct Costs | $18,054.29 |
| Indirect Costs – 40% | 7,221.72 |
| | $25,276.01 |
| Profit and Overhead – 21% | 5,307.96 |
| | $30,583.97 |

ty for the fact that this remedial measure does not give the 100% structural integrity that would exist had the job been done correctly. Therefore, the Authority is entitled to total damages of $33,642.37 for the plaintiff's failure to install the four inch square washers.

ALLOWANCE OF LIQUIDATED DAMAGES

■ The plaintiff asserts that liquidated damages should not be assessed because the $100 per day liquidated damages provision in the contract is unenforceable as a penalty. Whenever a dispute arises with regard to the amount of liquidated damages, the defense of unconscionable penalty is raised. If it is determined that the amount is not excessive, bears a rational connection to the damages actually sustained, or that it was a reasonable forecast of damages at the time the contract was made, such a defense will not succeed. *Rex Trailer Co. v. United States,* 350 U.S. 148, 76 S.Ct. 219, 100 L.Ed. 149 (1956) (citing *Priebe & Sons v. United States,* 332 U.S. 407, 68 S.Ct. 123, 92 L.Ed. 32 (1947)); *Wilson v. Clarke,* 470 F.2d 1218 (1st Cir.1972) (applying Massachusetts law); *A–Z Servicenter v. Segall,* 334 Mass. 672, 138 N.E.2d 266 (1956). Section 111(b) of the General Specifications provides that this was the amount fixed for liquidated damages "it being impossible to determine the actual damages occasioned by the delay..." If actual damages were readily apparent or easily provable, there would be little need for liquidated damages. It is just to avoid the uncertainty and expense of determining actual damage that the proponent seeks to establish this element by agreement. Liquidated damage provisions are appropriate when it is difficult to accurately estimate the harm caused by the delay. *Wilson v. Clarke, supra,* at 1223. In *Priebe & Sons, supra,* the United States Supreme Court observed:

> Today the law does not look with disfavor upon "liquidated damages" provisions in contracts. When they are fair and reasonable attempts to fix just compensation for anticipated loss caused by breach of contract, they are enforced... They

serve a particularly useful function when damages are uncertain in nature or amount or are unmeasurable, as is the case in many government contracts... And the fact that the damages suffered are shown to be less than the damages contracted for is not fatal... *Id.* 332 at 411–12, 68 S.Ct. at 125–26.

As long as the parties are free to deal at arms length with no compulsion on either side, and the terms do not shock the conscience, the Court should not interfere with their agreements.

In a case which originated in Massachusetts, the Supreme Court quoted with approval from an earlier opinion of the Court:

> The courts are "strongly inclined to allow parties to make their own contracts, and to carry out their intentions, even when it would result in the recovery of an amount stated as liquidated damages, upon proof of the violation of the contract, and without proof of the damages actually sustained." *Kothe v. R.C. Taylor Trust,* 280 U.S. 224, 225–26 [50 S.Ct. 142, 143, 74 L.Ed. 382] (1930) (quoting *United States v. Bethlehem Steel Co.,* 205 U.S. 105, 119 [27 S.Ct. 450, 455, 51 L.Ed. 731] (1906)).

■ The fact that the instant case involves a municipal contract, where public funds and convenience are concerned, makes it more imperative that reasonable provision be made to compensate for delays encountered. In addition, all the bidders were confronted with the same competitive conditions and to now alter a term that may well have affected awarding of the bid does not appear justifiable. As I observed in the liability opinion, Federico was an experienced contractor who knew the terms of the contract and its explicit provisions. The time to object to the rate of liquidated damages was before the contract was signed. *Manganaro Drywall, Inc. v. Penn-Simon Construction Co.,* 357 Mass. 653, 260 N.E.2d 182 (1970).

Federico was fully aware of the time constraints, and from the very beginning was negotiating with the Authority for ex-

tensions. Several of the extensions were granted, but the Authority always made it clear that unless Federico improved the rate of performance, it intended to enforce the liquidated damages provision.

The provision for liquidated damages is standard in municipal contracts, and no evidence has been offered to suggest that the $100 per day rate is an unreasonable estimate of what actual damages might have been.

None of the cases cited by the plaintiff contradict this Court's finding that the agreed to $100 per day rate for liquidated damages is reasonable. Therefore, such damages may be assessed against Federico for unexcused delay and are not in the nature of a penalty.

## LIQUIDATED DAMAGES

 Liquidated damages are appropriate. In keeping with Section 111 of the General Specifications and for other reasons including the recognition of some entitlement of the contractor to periods of excusable delay prior to May 5, 1976, the Authority, at its meeting of May 5, 1976, had extended the completion date to October 30, 1976 from the original contract completion date of November 24, 1975. In the liability trial, the Court determined that the liquidated damages could start from October 30, 1976, the extended completion date. The Court found that the contract was substantially completed by December 1, 1978 and therefore, in the context of this case, that is the date on which liquidated damages must terminate. Were the contractor unable to prove entitlement to additional excusable delay after October 30, 1976, the Authority would be entitled to 761 days of chargeable delay at the contract rate of $100 per day. The burden is on the contractor to reduce or eliminate that number of days by proving "excusable delay" as defined in Section 111(c).

The first area that the plaintiff argues it should be entitled to excusable delay is the delay caused by encountering a ledge along the north side of Leonard's Wharf. The plaintiff states that the ledge was not indicated in the plans and that it caused a three

week delay in driving the sheeting. While the ledge may have caused a delay, this delay occurred in 1975 prior to the Authority meeting on May 5, 1976 which granted the last extension and would have been taken into account in the Authority's extension of the time for completion.

Plaintiff next argues that in August, 1975, there was a delay in the delivery of the steel sheeting. However, I would find that this delay was also credited in the Authority's earlier extension of time.

The plaintiff states that the construction of Louie's-on-the-Wharf Restaurant slowed the job. This construction does not fall within the definition of excusable delay and even the plaintiff's brief aside from mentioning this, attributes no specific time to it.

The plaintiff claims that it was delayed for 16 months due to encountering the Raymond concrete piles and other heavy debris. In the liability section, the Court found that the Authority withheld information which would have revealed the existence of the concrete piling, though the contractor is not blameless since a low tide careful visual examination of the remaining pier and environs would have alerted the contractor to the potential of the piles. Nonetheless, plaintiff is entitled to some excusable time for having to remove the piles though not the other heavy debris which the Court found was or should have been known to the contractor. Further, in the liability case, the Court found that Federico was not entitled to the time it spent using the wrong machinery, and certainly not for using it again in April and May of 1978 when Federico had to excavate outside the sheeting line. Not surprisingly, Federico hit the same obstructions and the equipment still did not work. Additionally, most of the problem occurred prior to May 5, 1976 and was already at least partially allowed for. When Federico found the right piece of equipment, the Salah & Pecci crane, 5,000 cubic yards of the most difficult excavation was accomplished in only 40 days.

The evidence presented is that there was a total of approximately 60,000 cubic yards

of material excavated. Of this 60,000 cubic yards, approximately 20,000 cubic yards was removed from the obstructed area. I have already determined that Federico is only allowed to recover extra cost for removing Raymond concrete piles and the material entwined therewith, of which there was 1,443 cubic yards. In terms of the delay caused by the excavation, Federico originally bid based upon only having to remove 3,000 cubic yards of material. The contractor should not be penalized for taking longer to do 20 times the work. Therefore, excusable delay is involved in just having to remove 57,000 more cubic yards than initially anticipated. Mr. Capacefalo testified that he based his initial calculation on removing 500 cubic yards per day. Therefore, it would have taken them six days to remove the 3,000 cubic yards. That would leave an extra 57,000 cubic yards from which the 1,443 cubic yards of Raymond concrete pile should be excluded. To remove the remaining 55,557 cubic yards of material at the rate of 500 cubic yards per, would take about 111 days. Therefore, Federico is entitled to an allowance of at least this time.

In addition, there should be an allowance made for the time it took to remove the Raymond concrete piles. The evidence shows that it took Salah & Pecci about 40 days to remove about 5,000 cubic yards of the most difficult material including Raymond concrete piles. This rate would be about 125 cubic yards per day. Applying this rate to the 1,443 cubic yards of Raymond concrete pile, I find that this work should have taken an additional 12 days. In total, Federico had to spend an extra 123 days on the excavation and should not have to pay liquidated damages for this time. Since the crews worked a five-day week, Federico should get additional credit for 24 weekends or 48 days, making it a credit of 171 days.

In the liability section, I found that Federico could prove excusable delay due to removing Raymond concrete piles, but they were not entitled to any delay for the time they spent trying to use inadequate machinery. Had Federico brought in the proper

equipment initially, they may have been able to complete their work, if not within, at least closer to the extended contract completion date. Further, the Authority took the obstructions problem into account in extending the completion date to October, 1976. Therefore, it can be argued that the excusable delay should be shortened somewhat due to Federico's experimenting with inadequate equipment. However, there is a countervailing consideration in the difficulties caused directly and indirectly by the Raymond concrete piles. While the actual cubic yardage of piles was small, the location of the piles, both as to their location in the mud and in areas of other debris, delayed the excavation process throughout the 20,000 cubic yard area. Even the NBRA's witness, Steve Cassidy the diver, testified that the excavation of the piles was like playing pick up sticks and that some piles had to be excavated individually, using divers and slings. There are no exact measurements in a case such as this but it is reasonable to assume that Federico's delay due to experimenting is offset by the excusable delay caused at least in part by the unexpected difficulty of the excavation of the piles that contributed to reducing the Salah & Pecci capacity to 125 cubic yards per day. I find excusable delay caused both by the piles and the added excavation to be 171 days. Mr. Capacefalo testified that there was some delay in getting the right piece of equipment since it was not readily available in the Boston area but this would be included in the October 5, 1976 extension.

In addition, the plaintiff claims that there was a six month delay due to driving the steel sheeting, which then hit obstructions so that it had to be withdrawn, the area excavated and the sheeting reinstalled. It was Federico's responsibility under its contract to drive the sheeting and that included removing any obstruction that caused refusal before the proper depth. This responsibility included examination of the area by a diver before starting the driving. Mr. Capacefalo defends the failure to use a diver on the grounds that the

obstructions were below the mud line; however, investigation by a diver including probes by the diver and the visible out croppings would have warned the contractor of the need to excavate before driving.[6] In any event, the unexpected obstruction even if discovered in advance, would have entailed more excavation and time at least some of which should be excusable, but if the contractor seeks as much as six months, it must support that with more than just a casual estimate. Rather than disallow it all for inadequate proof, I would estimate and allow 1½ months (45 days) based on a four step process, namely, driving, removing, excavating, re-driving. The extra excavating has already been allowed for and after a reasonable initial refusal and discovery of the problem which shouldn't have exceeded 25% of the work, the driving should have stopped until the excavation was completed so that not more than one-quarter of the extra time should have been prudently necessary and that is probably generous since the six month estimate is undocumented. I would find 45 days of excusable time.

Next, Federico claims two weeks for subsurface obstructions along the south side of Leonard's Wharf. Since there was no evidence of collapse of Leonard's Wharf, I would wonder how the piles either got there or how the Authority could be accountable. In any event, since that work was done early in 1975, allowances were included in the May 5, 1976 extension.

Federico claims that it was delayed for four weeks due to the failure in and around the Parisi building located along Homer's Wharf which indicated that the building was in danger of collapsing. The evidence shows that work was delayed because the job sequence had to be changed, requiring the plaintiff to move equipment and work elsewhere while consultations took place. However, work did not entirely stop. Therefore, I find it reasonable to assume that if four weeks were needed for the work in the area, some time was saved by working elsewhere, a point often made by Capacefalo. I find that 14 days was excusable delay due to seeking a solution for the building failures.

The plaintiff alleges that there was significant delay due to the need to determine an alternative method of installing the tie-rod system. The alternative method was necessary because of the discovery of unanticipated obstructions and concrete cap underneath the existing building. During a test made in January of 1977, the cap caused the test tie-rods to meet refusal. While Federico argues that there were lengthy discussions between the parties as to how to install the tie-rods, the evidence indicates the Authority's engineers had been requesting the tie-rod plans since 1975. The specifications in § 115(a) provide that the contractor must submit shop drawings to the engineer for approval and that no extension will be granted by reason of the contractor's failure to do so.[7] At various times after April 1975, the engineer would request such drawings from Federico. The engineer did not receive the drawings until May 17, 1977 and promptly had them approved by May 23rd. Except possibly for HUD's rejection of one change order, the delay in drawings was not caused by the Authority.

Apparently, rather than make up a set of formal plans, Federico experimented with various methods of installing the tie-rods. Although Federico is entitled to some ex-

**6.** The Contractor shall be required to obtain the services of a diver to inspect the condition of the bottom surface immediately prior to pile driving. *Excavation of existing Boulders* or other obstructions at the piling shall be accomplished *before piles are driven.* Sec. 21.3.2 of the Specifications (emphasis added).

**7.** 115. SHOP DRAWINGS
 a. All required shop drawings, machinery details, layout drawings, etc. shall be submitted to the Engineer in 4 copies for approval suffi-

ciently in advance of requirements to afford ample time for checking, including time for correcting, resubmitting and rechecking if necessary. The Contractor may proceed, only at his own risk, with manufacture or installation of any equipment or work covered by said shop drawings, etc. until they are approved and no claim, by the Contractor, for extension of the contract time will be granted by reason of his failure in this respect.

cusable delay because of the unanticipated concrete which caused a reconsideration of the original tie-rod plan which lead ultimately to two change orders and the use of a more difficult and more time consuming process. Most of the six months delay which the contractor attributes to the problems of plan approval are not excusable delay in that they were caused not by the Authority or its engineers, but by Federico's inability to decide upon an approach and provide the Authority with a definitive plan.

Federico is not entitled to either that six months or the six month delay claimed for the added difficulty in the construction. This latter delay is largely estimated and unsupported by documentation. For example, the time that would have been spent under the original bid is not computed or deducted, and there is no explanation for the time that the men should have been working and were not. In addition, the delay in delivery of the tie-rods was not attributable to the Authority or to an unavoidable circumstance, but was caused by some payment problems. I find that Federico is entitled to two months of excusable delay caused by the need for drafting new procedures and getting HUD and Authority approval for change orders. The added time was not caused by the Authority but by Federico's procrastination in deciding on a procedure and submitting shop drawings. Federico is entitled to an additional four months because of the difficulty in installing the tie-rods through the concrete cap. This latter time I compute from the time involved in the change orders minus a recognition that some time would have been required under any system. Therefore, the tie-rod problem accounts for 183 days.

Finally, Federico claims that it took an extra two months to lower the wales. I have already found that the Authority consented to having the wales installed at + .5 at Federico's request and that Capacefalo

gave as the principal reason for this change, Federico's desire to save time. The time spent lowering 268 linear feet of wale may well have been time that Federico hoped to avoid but on balance washed with the time saved in installing 1,832 linear feet of wales, that is, the 2,100 linear feet of total wales less the 268 linear feet of wales that were first raised and lowered.

In summary, I find that Federico completed the contract 761 days after the last authorized completion date and that 413 days [8] of that amount were not chargeable to Federico as having been excusable delay. Therefore, the Authority is entitled to liquidated damages of $34,800 or 348 days times $100.

As part of its reply memorandum, the plaintiff has made a motion to strike portion of the defendant's memorandum for various reasons including misrepresentations, introduction of unsworn testimony and presentation of irrelevant issues. The Court is aware of defense counsel's sometimes wistful arguments. For example, as part of its trial memorandum, the NBRA has put in a motion to strike footnote 6 of the liability memorandum.

Footnote 6 concerned the Court's finding that Federico was entitled to recover for maintenance and protection of traffic, line item 34. Although there had been testimony that Federico had agreed to waive this item in exchange for the Authority's guaranteeing to cover an increase in the price of steel, the Court stated in footnote 6:

To the extent that this item was conditioned on a saving in steel prices, I find that the price of steel in fact exceeded the original price of the foreign steel by more than the amount of this item.

When the Authority's counsel orally moved to strike footnote 6, the Court denied the motion but did state that the Authority could submit any evidence it cared to submit on the issue of steel. Now in its post-

[8] RECAPITULATION

| | | |
|---|---|---|
| 1. Extra excavation including Raymond concrete piles | 171 days | |
| 2. Problem during sheeting | 45 days | |
| 3. Parisi problem | 14 days | |
| 4. Tie-Rod problem | 183 days | |
| Total Excusable Delay | 413 days | |

trial memorandum, the Authority states that any evidence as to steel prices would have been fruitless and meaningless due to footnote 6 and would have been subject to being stricken on the basis of relevancy. The Authority should have gone forward with its evidence during the trial rather than now speculating as to what would have happened had it gone forward. The Authority has had an opportunity to present its evidence. It chose not to do so. The Authority's motion to strike footnote 6 is denied.

As to plaintiff's motion to strike portion of the defendant's memorandum, the trial was jury waived and the Court's findings are only based on the evidence admitted at the trial. The motion is denied.

The summary of damages on the claims and counterclaims is as follows:

### D. FEDERICO'S CLAIMS

| | |
|---|---|
| 1) Total being withheld by Authority (see breakdown p. 824) | $252,457.52 |
| 2) Amount due line item 34 | 140,000.00 |
| 3) Amount due excavation | 129,870.00 |
| 4) Amount due lowering wales | – 0 – |
| | $522,327.52 |
| 5) Less: Credit for Overpayment on Change Orders | 1,552.26 |
| | $520,775.26 |
| D. Federico's Claims (carry forward) | $520,775.26 |

### AUTHORITY'S COUNTERCLAIMS

| | |
|---|---|
| 1) Amount due coal tar epoxy | $ 13,039.69 |
| 2) Amount due patch plates over bolt holes | 9,496.33 |
| 3) Amount due installing four inch square washers | 33,642.37 |
| 4) Amount due liquidated damages | 34,800.00 |
| | $ 90,978.39 |
| NET DUE FEDERICO | $429,796.87 |

Having determined the amounts due, the question remains as to what interest is due. Specifically, the question is whether there is penalty interest pursuant to Mass.Gen.Laws ch. 39 § 39G. The purpose of Mass.Gen.Laws ch. 30 § 39G is to assume prompt payment. It is the duty of the Authority to set out the items in dispute and to expedite payment to the contractor of the undisputed items. Penalty interest would not apply to items in dispute. *D. Federico Co., Inc. v. New Bedford Redevelopment Authority*, 9 Mass.App. 141, —— 1980 Mass.App.Ct.Adv.Sh. 199, 203, 399 N.E.2d 1103. The parties have agreed that the Authority was retaining $252,457.32. The plaintiff seeks penalty interest on this amount less $3,500 which the Authority was retaining to coat the tie-rod bolts. However, I find that all of the items claimed by the Authority were in dispute and therefore should be subtracted from this total sum.

| | |
|---|---|
| TOTAL RETAINED | $252,457.52 |
| LESS: AUTHORITY'S RECOVERY | 90,978.39 |
| | $161,479.13 |

Penalty interest pursuant to Mass.Gen. Laws ch. 30 § 39 should be determined on $161,479.13 and should run from February 5, 1978 to the date of payment. The Court found that the project was substantially completed on December 1, 1978 and the statute provides that interest will begin to run after 65 days if the Authority does not comply with its duties under the statute. Mass.Gen.Laws ch. 30 § 39G. The Authority should have no basis to complain even though the offset numbers were not established until this opinion since the damages being awarded are greater than those claimed in Mr. Horn's letter of January 25, 1979. As to the balance of the money owed Federico, interest is due pursuant to Mass. Gen.Laws ch. 231 § 6C from the date the complaint was filed until the date of payment.

Counsel for the plaintiff will have ten (10) days to submit to the Court and debtor's counsel his interest computations based upon the above findings. If counsel for the defendant disagrees with those computations, he should submit his calculations within seven (7) days thereafter.