**MIAMI VALLEY CONTRACTORS, INC., Plaintiff,**

v.

**TOWN OF SUNMAN, INDIANA, Defendant,**

v.

**RELIANCE INSURANCE COMPANY, Counter–Defendant.**

**No. IP 95–997–C–B/S.**

United States District Court, S.D. Indiana, Indianapolis Division.

April 23, 1997.

David L. Simmons, Hoffman Drewry Hancock & Simmons, Indianapolis, IN, for Plaintiff.

Alan H. Lobley, Ice Miller Donadio & Ryan, Indianapolis, IN, for Defendant.

### ENTRY DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT

BARKER, Chief Judge.

Plaintiff, Miami Valley Contractors, Inc. (MVC), brings its motion for partial summary judgment on the ground that the Defendant, Town of Sunman, Indiana (Sunman), has waived its right to seek liquidated damages relating to the completion of the first phase of the construction contract between them. MVC also maintains that the liquidated damages provisions in the contract impose unenforceable penalties, but that, even if enforceable, they should not be invoked because MVC substantially completed its work under the contract. For the reasons discussed below, MVC's motion for partial summary judgment is dented.

### I. STATEMENT OF FACTS

In January 1991, Sunman entered into an Agreed Order with the Commissioner of the Indiana Department of Environmental Management (IDEM) in which Sunman acknowledged that it had violated the Indiana Environmental Management Act by failing properly to treat wastewater. MVC Motion Ex. § at 1–2. As required by the Agreed Order, Sunman solicited bids and ultimately

hired MVC to construct a wastewater treatment facility. MVC Motion Ex. O.

Funding for the facility came from different sources, including the Department of Commerce (DOC). DOC committed to give $500, 000 to Sunman, provided the Town could obligate the entire amount by December 31, 1993. MVC Motion Ex. C, Tinkle Dep. at 27. It was primarily because of this deadline that the construction of the sewerage plant was separated into two phases in the contract between Sunman and MVC. Phase I called for the completion of seven items, including "polishing ponds," and was to be completed by the DOC-imposed December 31, 1993 deadline; Phase II provided for the balance of the work and required completion within 365 days after the project was officially commenced. MVC Ex. A. Because Sunman's damages would be different, depending on whether MVC failed to complete one of the Phases of construction or the other by its respective deadline, the Agreement provided for liquidated damages of $1,000–per–day if Phase I was not timely completed, and $500–per–day if Phase II was not timely completed. Sunman Ex. H at 1–2.

Largely because of poor weather conditions, DOC extended its grant-eligibility deadline to March 31, 1994. MVC Motion Ex. P. At some point before the March 31st deadline, Sunman reduced the amount of work to be completed as part of Phase I, it having become clear that only three items—an equalizations tank, aerobic digester, and sludge beds-needed to be completed in order to obligate the entirety of DOC monies. MVC Motion Ex. B, Tinkle Dep. at 29–30. The parties did not modify the contract in writing, notwithstanding that the contract required all modifications to occur by written change order. MVC Motion Ex. M at GC–7, ¶ 13.1. Thus, although the final agreement provided that the polishing ponds did not need to be completed by the DOC deadline in order for Sunman to receive DOC funds, the written version of the Sunman–MVC contract still required the ponds to be constructed as a part of Phase I.

## II. LEGAL ANALYSIS

### A. Summary Judgment Standards

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.Pro. 56(c). A genuine issue of material fact exists if there is sufficient evidence for a jury to return a verdict in favor of the non-moving party on the particular issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Methodist Med'l Ctr. v. American Med'l Sec., Inc.*, 38 F.3d 316, 319 (7th Cir.1994).

On a motion for summary judgment, the burden rests on the moving party to demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). After the moving party demonstrates the absence of a genuine issue for trial, the responsibility shifts to the non-movants to "go beyond the pleadings" and point to evidence of a genuine factual dispute precluding summary judgment. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53. In considering a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the non-movants. *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 392 (7th Cir.1992). Thus, if genuine doubts remain, and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir.1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989).

Nevertheless, only issues of fact that could affect the outcome of a case are "genuine" such that they may save a case from summary judgment. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir.1994). And, "[s]ummary judgment is appropriate in a matter of contract interpretation where no issues of fact exist because the language of the contract is unambiguous." *Grundstad v. Ritt et al.*, 106 F.3d 201, 205 (7th Cir.1997).

### B. Submissions Without Leave

In its Opening Brief, MVC argues, first and foremost, that Sunman waived its right

to liquidated damages from Phase I and, thus, it is foreclosed from seeking them in reference to the polishing ponds. Fundamental to MVC's argument is its contention that the polishing ponds are Phase I items.

In its Response to MVC's motion, *Sunman* rejoins that the polishing ponds were "*de facto*" Phase II items and therefore it is not foreclosed from seeking liquidated damages relating to them. Sunman cited three letters as evidence that the ponds were regarded as Phase II items. Surprisingly, Sunman made no meaningful attempt to argue that the contract had been modified, citing no legal authority to support the occurrence of a *de facto* modification.

Naturally, in its Reply, MVC pounced, noting that the contract by its very terms required a written change order if it were to be modified. MVC Motion Ex. M at GC–7, ¶ 13.1. It minimized Sunman's "new contract term, the 'defacto' [sic] understanding," Plaintiff's Response at 4, and cited legal authority supporting the "four corners rule" of contract interpretation. Plaintiff's Response at 9. Sunman could not have been surprised at this response, since the issue of contract modification was raised by MVC at the outset Nevertheless, Sunman submitted to this court a "Supplemental Designation of Authorities in Response To Plaintiff's Reply Brief in Support of Summary Judgment," in other words, a sur-reply, in which it argued that a contract may be modified through words or actions, even if the contract terms require written modification. Unfortunately for Sunman, it neither was entitled to file a sur-reply nor did it seek leave of court to do so.

MVC then filed a "Supplemental Designation of Authorities in Response To Defendant's Supplementary Designation of Support of Brief in Opposition to Summary Judgment" in other words, a sur-response. In that Brief, MVC did not address the legal contentions newly raised in the unauthorized sur-reply, indeed, it did not need to, having properly addressed the issue of modification in its first two briefs. Instead, it cited an alleged admission by Sunman, contained in Sunman's Responsive Pleading, regarding the Phase I status of the polishing ponds. Compounding the procedural errors, MVC did not seek leave of court to file its sur-response.

But there was even more in store for the court: on January 30, 1997, Sunman filed another document, this one entitled "Town of Sunman's Supplemental Submission of Exhibits in Opposition to the Plaintiff's Motion for Partial Summary Judgment" MVC objected, moving to strike Sunman's supplemental submission of exhibits. Sunman opposed that motion to strike, and, although it couldn't actually say that MVC got these briefing excesses started, it nevertheless tried, asserting that "Sunman's counsel do not ... understand the plaintiff's objection under the circumstances. The plaintiff filed a Supplemental Designation of Authorities, without first obtaining the Court's permission to do so...." Defendant's Opposition to Plaintiff's Motion to Strike, ¶ 2.

■ The court operates within procedural rules, and all parties are subject to them in conducting their litigations. Local Rule 7.1(a) provides:

> *Unless the Court otherwise directs* an adverse party shall have fifteen (15) days after service of the initial brief in which to serve and file an answer brief and the moving party shall have seven (7) days after service of the answer brief in which to serve and file a reply brief.

S.D. Ind. Local Rule 7.1(a) (emphasis added). The Rule makes no mention of a sur-reply or a sur-response, because the Court has determined that such extended motion practice is generally unnecessary. *Cf. McDonald v. Schencker*, 18 F.3d 491, 496 (7th Cir.1994) ("[A] sur-reply brief may be overkill and possibly a wasted effort since filing requires leave of the court.").

Sunman created its own problems when it was remiss in its Response to MVC's motion for summary judgment by thoroughly failing to address the legal issues surrounding the so-called *de facto* contract modification. This issue was fairly raised in MVC's Opening Brief. But MVC was also remiss in advancing the additional submission in which it asserted an alleged admission by Sunman which had been made in the Pleading-phase

of this litigation. This argument could easily have been included in MVC's motion for summary judgment and its oversight is the only plausible excuse for MVC's failure to do so.

There is no question that these unauthorized submissions could properly be excluded from consideration by this Court. *See Clinkscales v. Chevron U.S.A., Inc.* 831 F.2d 1565, 1568–69 (11th Cir.1987) (affirming exclusion of surrebuttal materials, stating, "Where, as here, the local rules do not provide for surrebuttal briefs, we conclude that the ... district court may in its discretion allow a surrebuttal brief where the non-movant's failure to filly respond to the motion in its original response was due to excusable neglect."); *Hartley v. Wisconsin Bell Inc.*, 930 F.Supp. 349, 353 (E.D.Wis.1996) (excluding supplemental materials because "[a]t no time did the defendant seek leave of this court to file the materials ... [and it] has failed to identify a justification for the late submission...."); *Boustead v. Barancik*, 151 F.R.D. 102, 106 (E.D.Wis.1993) (striking supplemental brief because the "local rules do not allow the non-movant to file a sur-reply or any other material as a matter of right. The case law reveals that a non-movant will only be allowed to file a sur-reply or other supplemental material upon receiving leave of court.") (citing cases); *see also Gordon v. Degelmann*, No. 92–C–6891, 1993 WL 286470, at *2 (N.D.Ill. July 28, 1993) (granting Defendant's leave to cite additional authority because significant and relevant case was new and published post-briefing). Nevertheless, we will forebear and permit the unauthorized sur-briefs to stand. But both parties are admonished not to duplicate the practice of submitting supplemental briefs without prior authorization in the future. Seeking permission is not a mere technicality to be overlooked or indulged by the Court. As stated, the Rules of Procedure exist to ensure that the adversarial process works fairly, as well as to ensure that the Court not be drawn into monitoring endless bickering between litigants and into frustrating attempts to keep up with moving targets.

■ Although we will permit consideration of the sur-briefs, we will not consider Sunman's additional submission of supplemental exhibits for purposes of MVC's motion for summary judgment. On January 30, 1997, we ordered the trial date in this action vacated and reassigned because the motion for partial summary judgment was "now fully briefed." (Order, January 30, 1997.) Without leave of Court Sunman proceeded to submit its supplemental exhibits to this Court on February 12, 1997.

As noted above, in support of its Response in Opposition to MVC's motion for summary judgment, Sunman produces three letters to establish that the polishing ponds were *de facto* Phase II items. Plainly, Sunman understood at that point in the litigation that it needed to marshal evidence in support of its position to the contrary, even if it did not realize that it also needed legal authority. Sunman had ample time to prepare its Response and to gather its supporting evidence. In fact, we granted not one, but two requests by Sunman for extensions of time to file its Response, thereby allowing Sunman thirty-one days to respond to MVC's opening motion. Sunman does not offer any justification for its failure to make timely submission of its supplemental exhibits at the Response phase of the litigation. Nor does it offer any justification, beyond an inadequate "they started it" (not even true), to explain its failure to seek leave of Court to file its supplemental exhibits. Accordingly, MVC's motion to strike Sunman's supplemental exhibits is **GRANTED.**

## C. *Modification*

■ It is undisputed that the polishing ponds were initially designated as Phase I items. See Sunman's Answer & Counterclaim (admitting that Phase I of the contract required MVC to construct "modifications of the existing effluent polishing ponds").[1] Sunman maintains that the contract was modified to provide that the ponds become

---

1. MVC cites this admission as proof-positive that the polishing ponds remained Phase I items. Yet Sunman's admission proves only the undisputed fact that the polishing ponds were initially desig-
nated as Phase I. It provides no insight into the parties' subsequent understanding of the ponds' status.

Phase II items. It also maintains that the fact that the DOC funds were conditioned on the division of the project into phases was the only reason for dividing it as they did, and that, since the polishing ponds were taken out of Phase I, they obviously and necessarily became Phase II items. Accordingly, Sunman is seeking Phase II liquidated damages to remedy the alleged failure by MVC to complete the polishing ponds in a timely fashion.

MVC contends that a written change order is required to modify the contract and that, because there was none, the ponds remained in Phase I. Further, it contends that Sunman has waived Phase I damages, making liquidated damages unavailable for any alleged failure to complete the ponds.

 The contract agreement clearly required all modifications to be made in writing. *See* MVC Motion Ex. M at GC–7, ¶ 13.1. However, it is equally clear that a contract may be modified by words or actions, provided there is evidence that the parties intended to modify the contract.

> Parties to a contract may mutually modify their contractual undertakings, and it is not always necessary to prove a written or oral modification of a contract because modification of a contract can be implied from the conduct of the parties. Even a contract providing that any modification thereof must be in writing may nevertheless be modified orally.

*City of Indianapolis v. Twin Lakes Enters., Inc.,* 568 N.E.2d 1073, 1084–85 (Ind.App. 1991) (internal citations omitted); *see also Urbanational Developers, Inc. v. Shamrock Eng'g, Inc.,* 175 Ind.App. 416, 372 N.E.2d 742, 748 (1978) (questions of whether parties verbally agreed to modify contract precluded summary judgment, notwithstanding that contract required any modification to be in writing).

Sunman maintains that the Phase I and Phase II designations were for funding purposes only and that after it became clear that only three of the original seven items designated Phase I needed to be completed in order to obligate the DOC grant, the contract was modified by a mutual understanding to the effect that the polishing ponds were

Phase II items. The contract provides that the project "is divided into two (2) phases for finding purposes." Sunman's Ex. C at DS–0–1. However, it does not state that the designation into two phases was solely for funding purposes. In addition, the contract plainly assigns liquidated damages on the basis of whether an item falls in Phase I or Phase II. Sunman's Ex. C at DS–0–2–3.

Sunman concedes that, in hindsight, it would have been better to issue a written change order to clarify what items were to remain in Phase I, Sunman Ex. B (Tinkle Dep. at 30), particularly since the contract, by its own terms, requires written modification. However, Sunman adduces deposition testimony and three pieces of correspondence to support its position that the parties mutually agreed that the polishing ponds were Phase II items. The first is a letter from G. Edwin Tinkle ("Tinkle"), the Project Manager, to MVC, stating in relevant part:

> relative to your letter dated March 2nd regarding another time extension, as long as the equalization basin, sludge drying beds and aerobic digesters are on-line and operating in a substantially complete mode by March 31st there is no need for a time extension. If these units are operational, the intent of the Phase I work has been met.

Sunman Ex. E. According to the testimony of Tinkle, provided at his deposition, although a written change order would have been a "cleaner" way to modify the contract, it was his belief that this letter "delineated ... three items of work, ... equalization basin, the digester, and the sludge drying beds, as being the items that would make up the phase I [ (one) ] work for the purposes of the March 31st date." Sunman Ex. B (Tinkle Dep. at 30).

Sunman references another letter from Tinkle, this one directed to the Sunman City Council. It states:

> Please note; [sic] however, for Phase I, the Certificate is only a *Partial* Certificate excluding the polishing ponds, since they are considered to be *not* substantially complete. Of Phase I, the September 29, 1994 date was the date the handrailing was

completed on the Phase I items thereby making these facilities operational. The Phase I work, including punch-list items, was fully completed on October 30, 1994. For Phase II, the September 29th date was the day all Phase II items with the exception of the polishing ponds were substantially complete. Many items on the punch-list attached to the Phase II Certificate remain incomplete and obviously, the Phase II work is not fully completed.

Sunman Ex. L. Finally, a third letter from Tinkle to MVC is cited, which apparently accompanied certificates of substantial completion for Phase I and II items:

> As noted, the Phase II Certification is a partial Certificate covering all Phase II work except for the polishing ponds, which have not been constructed to the specifications and are not considered operational. . . .
>
> The date of substantial completion for both Certificates is September 29, 1994. According to our records, Phase I was fully completed on October 30th, Phase II remains to be completed.

Sunman Ex. K Whatever else may fairly be stated with respect to this evidence it is at least sufficient to create genuine issues of material fact regarding whether the parties had mutually intended to modify their contract and shift the polishing ponds from Phase I to Phase II for completion.

MVC maintains that Sunman did not regard the polishing ponds as Phase II items, because it originally sought both Phase I and Phase II liquidated damages. Another letter from Tinkle, directed to the Sunman Town Council and advising of possible damages it might assert against MVC, states:

> It is our opinion that the Phase I work was filly completed on September 29, 1994, thus the damage is calculated as follows: . . . Total[:] 182 days @ $1,000 = $182,000.

Relative to Phase II, the work, as you are aware, is not completed, thus the damages to date are: . . . Total[:] 19 days @ $500/day = $9,500

> Thus, the total *possible* liquidated damage to date is $191,500 for both phases.

MVC Reply, Ex. B at 1–2 (emphasis supplied). MVC references a letter from the Sunman Town Council to MVC, informing MVC of the amount of liquidated damages assessed against it. MVC Reply Ex. C (proffering the figures ($182,000 and $9,500) submitted to it by Tinkle).

Although these documents make clear that Sunman initially pursued liquidated damages based on Phase I against MVC, they do not indicate whether Sunman premised its entitlement to those damages on the fact that the polishing ponds were incomplete Phase I items, or because it believed some other Phase I item was incomplete by the operative deadline. Accordingly, we believe a genuine issue of material fact exists regarding whether the contract was modified to provide that the polishing ponds, by mutual agreement, were converted to Phase II items. Accordingly, MVC's motion for partial summary judgment on this basis is **DENIED**.

## D. *Waiver of Liquidated Damages Relative to Phase I*

■ MVC maintains that, in the event that the polishing ponds are determined to be Phase I items, Sunman is foreclosed from seeking liquidated damages because Sunman has waived its right to pursue Phase I liquidated damages. There is no question that Sunman initially pursued liquidated damages based on Phase I completions. *See* Sunman Answer & Counterclaim, ¶ 4. There is also no question that, notwithstanding its initial request for relief, Sunman no longer seeks Phase I liquidated damages.[2]

---

**2.** *See* MVC Motion Ex. K (Sunman's Answer to Miami Valley's First Set of Interrogatories, Question 12, at p. 9 (responding "none" when asked to identify all Phase I liquidated damages being sought)); MVC Motion Ex. L (Case Management Plan, Section IV, at p. 8); MVC Motion Ex. B, Sunman's Final Contentions, ¶ 7 (stating that the "Town believes that [Phase I] damages ha[ve] been waived and now only asserts its claim for liquidated damages by reason of the failure to complete the whole project by September 30, 1994."); MVC Reply Ex. D, at 22 (Sunman attorney, Alan Lobley, stating in deposition of MVC contractor, "We're not seeking liquidated damages for the delay on Phase I. I don't know why you're pursuing these questions. I don't see where they're relevant.").

However, Sunman maintains that it waived liquidated damages tracing to Phase I only because it regarded the polishing ponds as Phase II items. It contends that, although it did, in fact, abandon its claim to Phase I damages, it did not do so intentionally or knowingly as to the polishing ponds. It also requests that, if a determination is made that the polishing ponds were Phase I items, rather than Phase I, it be permitted to amend its position and seek Phase I damages tracing to the polishing ponds.

"Waiver has been defined as an intentional relinquishment of a known right involving both knowledge of the existence of the right and the intention to relinquish it." *Twin Lakes,* 568 N.E.2d at 1077; *van de Leuv v. Methodist Hosp. of Indiana, Inc.,* 642 N.E.2d 531, 533 (Ind.App.1994). The burden to prove waiver rests on MVC, *Twin Lakes,* 568 N.E.2d at 1077; *van de Leuv,* 642 N.E.2d at 533, and MVC has not sustained its burden to establish that Sunman knowingly and intentionally waived its right to pursue liquidated damages tracing to the polishing ponds.

Although Sunman had quite clearly and thoroughly abandoned its claim to liquidated damages tracing to Phase I, it is plain that Sunman never intended to abandon its claim to liquidated damages tracing to the alleged failure to complete the polishing ponds. While it may have been ill-advised for Sunman to abandon its pursuit of Phase I damages, given the existence of an issue as to whether the parties modified their contract and mutually intended to treat the polishing ponds as Phase II items, we cannot say that when it did so, it intentionally and knowingly waived its right to liquidated damages tracing from the polishing ponds.

For example, in its Answer to MVC's First Set of Interrogatories, Sunman responded that it was not seeking liquidated damages based on Phase I construction. However, it also asserted that "the major obligation not performed was the completion of the Polishing Lagoons." MVC Motion Ex. K (Sunman's Answer to Miami Valley's First Set of Interrogatories, Question 10, at p. 6). In its Final Contentions, Sunman did, indeed, state that it waived Phase I damages, but it cou-

pled that waiver with its contention that Phase I was administratively reduced to include only three items; Sunman thus clearly intended to pursue liquidated damages tracing from the polishing ponds, which it represented to be Phase II items. MVC Motion Ex. B, Sunman's Final Contentions, ¶¶ 7, 10, 11.

MVC maintains that it will be unfairly prejudiced if Sunman is deemed not to have waived Phase I liquidated damage claims relating to the polishing ponds, because it has conducted discovery and fashioned its position in this litigation on the understanding that those damages were waived. Given that Sunman has continually pursued damages relating to the polishing ponds, even while waiving its right to Phase I damages, MVC cannot credibly claim that it is surprised to learn that Sunman seeks compensation for the alleged failure by MVC to timely complete the polishing ponds.

Accordingly, because there are genuine issues regarding whether Sunman intentionally and knowingly waived its right to pursue Phase I liquidated damages tracing to the polishing ponds, MVC's motion for partial summary judgment on this ground is **DENIED.**

### E. *Enforceability of Liquidated Damages*

■ MVC argues that the liquidated damages provisions assigned to Phases I and II in the contract are not enforceable because they are grossly disproportionate to the actual damage Sunman endured and consequently act as an impermissible penalty. MVC maintains that because Sunman's damages were reduceable to a sum certain and are only available as a form of compensation, they cannot be properly awarded here because they would be more in the nature of an incentive for performance of the contract, rather than compensation.

■ The question of whether a provision is unenforceable as a penalty or as damages is a question of law solely for the court to resolve. *A.V. Consultants, Inc. v. Barnes,* 978 F.2d 996, 1001 (7th Cir.1992) (applying Indiana law); *Mandle v. Owens,* 164 Ind. App. 607, 330 N.E.2d 362, 364 (1975), *trans.*

*denied,* 265 Ind. 252, 353 N.E.2d 465 (1976). Liquidated damages are an appropriate remedy and will be enforced where "actual damages are uncertain or difficult to ascertain or prove or are of a purely speculative character and the contract furnishes no data for their ascertainment." *Raymundo v. Hammond Clinic Ass'n,* 449 N.E.2d 276, 283 (Ind.1983) (quoting *Beiser v. Kerr,* 107 Ind.App. 1, 20 N.E.2d 666, 669 (1939)). Under these circumstances, Indiana courts enforce liquidated damages provisions, provided "the sum contracted to be paid does not appear to be unreasonable in amount." *Raymundo,* 449 N.E.2d at 283; *see also A.V. Consultants,* 978 F.2d at 1001 (applying Indiana law) (stating Indiana "recognizes the validity of contractual provisions for liquidated damages where damages are hard to calculate and the liquidated damages themselves are not unreasonable.").

■■■■■ Damages are to be evaluated as of the time of the making of the contract and are deemed unreasonable "when they are 'grossly disproportionate to the loss which may result from the breach' or unconscionably in excess of the loss sought to be averted." *A.V. Consultants,* 978 F.2d at 1001 (quoting *Raymundo,* 449 N.E.2d at 283); *Priebe & Sons, Inc. v. United States,* 332 U.S. 407, 412, 68 S.Ct. 123, 126, 92 L.Ed. 32 (1947); *see also Hahn v. Drees, Perugini & Co.,* 581 N.E.2d 457, 462–63 (Ind.App.1991) (when determining whether liquidated damages clause is valid, examine "the facts, the parties' intentions, and the reasonableness of the stipulation under the circumstances of the case."); *Rajski v. Tezich,* 514 N.E.2d 347, 349 (Ind.App.1987) ("reasonableness is the touchstone" for determining whether liquidated damages clause is enforceable). When liquidated damages are grossly disproportionate to actual damages, they are deemed a penalty and thus unenforceable. *A.V. Consultants,* 978 F.2d at 1001; *see also Priebe,* 332 U.S. at 411–13, 68 S.Ct at 126–27. Yet, while reasonableness and proportionality are polestars in an inquiry into whether a liquidated damage provision is enforceable, there are no "hard and fast guidelines" and the determination of enforceability turns on the balance of the particular equities of the case. *Zalewski v. Simpson,* 435 N.E.2d 74, 77 (Ind.

App.1982) (quoting *Skendzel et al. v. Marshall et al.,* 261 Ind. 226, 301 N.E.2d 641, 645 (1973)). Thus, with these principles in mind, we examine whether the liquidated damages provisions in this contract are reasonable in light of the parties' ability a *ex ante* to determine the amount of damages occasioned by a breach and whether the damages were designed to be compensatory rather than punitive.

MVC argues that the liquidated damages penalties from Phases I and II are not enforceable because any actual damages arising from a failure to complete the work in these phases of construction were settled and knowable at the outset It maintains that the penalties of $1,000–per–day for failure to complete Phase I and of $500–per–day for failure to complete Phase II are grossly disproportionate to the amount of damages Sunman sustained for failure to complete the phases of construction.

MVC invokes the Agreed Order between Sunman and the IDEM as evidence that Sunman's damages were certain and knowable. The Agreed Order did, indeed, establish that Sunman would be liable to the IDEM for a total of $5,948.00 for past violations pertaining to water treatment MVC Motion Ex. S, Agreed Order, at 4. Sunman was obligated to pay $948.00 after entering into the settlement agreement, and the balance of monies, the $5000.00 was divided into ten installments of $500 each. The Agreed Order specified that for each of ten construction deadlines Sunman missed, it would be required to pay one installment of $500. Thus, Sunman was liable for a maximum of $5000 arising from past violations under the Agreed Order, if construction deadlines were not complied with. On the basis of this $5000 amount, MVC maintains that Sunman's actual damages were knowable at the time it crafted the so-called liquidated damages provisions.

MVC's argument fails to take into account, however, that the $5000–sum in the Agreed Order was a civil penalty for *past* violations only. The Agreed Order did not specify what fees or penalties Sunman would be required to pay if IDEM regarded Sunman

as not having complied with the terms of the settlement agreement MVC also fails to acknowledge that Sunman could have incurred significant, unascertainable damages, beyond any additional fees possibly imposed by IDEM.

For example, Tinkle, the Project Manager, testified in his deposition that a $500 liquidated damages provision is "the standard in the industry," established by the Farmers Home Administration for these types of construction contracts. Sunman's Reply Ex B, Tinkle Dep. at p. 70. He testified further that the $500 figure was used in the contract with MVC because it was the "best estimate" on the cost of maintaining an inspector on site, as well as for "associated engineering cost[s]." Sunman's Reply Ex. B, Tinkle Dep. at 72. According to Tinkle, the cost is not only the industry standard, but also "what we could expect to be incurred or anticipate possibly being incurred if the ... time went over from an engineering point of view." Sunman's Reply Ex. B, Tinkle Dep. at 70.[3] When assigning an amount for liquidated damages to the two phases of construction, Tinkle testified that they used the $500–base figure, then added another $500 for failure to timely complete Phase I. He stated that this $1000 damages figure for Phase I was "simply just an estimate, a guesstimate, of the amount of funds that it would take to cover potential damages that the City might have in the event that that [DOC] grant was—was, let's say, lost or partially lost or jeopardized." Sunman's Reply Ex. B, Tinkle Dep. at 70. Notably, MVC does not include in its argument the fact that Sunman's actual damages resulting from the possible loss of the DOC grant was, in fact, a sum certain-the DOC grant having been for the sum certain of $500,000. Thus, Sunman's potential actual damages for failure to complete Phase I of the contract were, potentially, significantly higher than the $1000–per–day liquidated damages clause entered into. At a rate of $1000 per day, it would have taken more than 500 days beyond the Phase I deadline for Sunman to be compensated for its actual loss, in the event the DOC grant was lost. Arguably, therefore, the $1000–per–day liquidated damage amount was agreed upon in an attempt to keep the fee reasonable.

In addition to these definite, but not fixed, damages, Tinkle testified that "intangible damages" necessitated the choice to provide for liquidated damages. These intangibles included Sunman's relationships with IDEM, the Decatur Circuit Court (which had entered the Agreed Order), the Farmers' Home Administration (another funding source), and the indeterminate, but certain effect upon the Town's residents. Sunman's Reply Ex. B, Tinkle Dep. at 174–75. Because these intangibles were difficult to assess with any certainty, liquidated damages were a reasonable and desirable option for both parties. *Cf. Raymundo*, 449 N.E.2d at 284 (upholding liquidated damages provision where "amount of such anticipatory expenses and losses is not susceptible of determination—either before or after the fact. Yet they are almost certain to occur."); *see also* Sunman's Reply Ex. B, Tinkle Dep. at 72 (stating that the $500–per–day liquidated damages provision is often used "short of going to actual damages for fear of contractors asking what all does that mean," and possibly being scared off from entering into contracts precisely because actual damages are unknowable and possibly exorbitant).

■ MVC *maintains that,* because Sunman drafted the contract, the provisions should be strictly construed and deemed unenforceable. *See e.g., Mandle*, 330 N.E.2d at 366 (strictly construing contract provision against party whose attorney drafted it). However, MVC does not allege fraud or even ambiguity in the contract provision, and, in fact, it is undisputed that before entering into the contract with Sunman MVC specifi-

---

3. MVC maintains that the $500–figure should not have been used as the base amount from which to calculate the Phase I liquidated damages, because engineers and inspectors were already scheduled to be on site for Phase II of the construction. Accordingly, MVC argues, Sunman knew it would not incur additional expenses for these items. However, Tinkle testified that "when we put the thing together, [we] had generally gone with the assumption that when phase I was done, we would be at a position to cut back very quickly into phase II back to a part-time scenario." Sunman Reply Ex. B, Tinkle Dep. at 34.

cally requested a clarification of the liquidated damages provisions:

> In reviewing the time of completion & liquidated damages section on page p–7 [of the original contract] it is not clear as to what penalty the contractor will suffer if he does not meet the Phase I deadline and the grant finding is withdrawn. Please clarify by addendum.

Sunman Reply Ex. I. Sunman obliged MVC's request for clarification by including in the contract a provision that, "in the event the work [in Phase I] is not *fully* completed within the time for completion, . . . [MVC] agrees to pay the Owner as liquidated damages . . . the sum of *One Thousand* Dollars (*$1,000.00* ) for each and every successive day until the work is filly completed." Sunman Reply Ex. H, Contract Addendum No. 1, at 1 (emphasis in original). With this clarification, MVC entered into the contract with Sunman. Plainly, there was "mutual personal intent in creating the provision . . . [of] true liquidated damages." *Rajski* 514 N.E.2d at 349.

MVC maintains that, by their very terms, the liquidated damages provisions are penalties, because the contract so states. MVC Motion Ex. R. Referencing a section of the contract entitled, "Time for Completion and Liquidated Damages," which provides:

> For every calendar day that full completion is delayed beyond the time specified, a *penalty* be paid by the Contractor to the Owner and it is hereby agreed by both parties that such *costs and expenses represent liquidated damages* caused by the delay of completion.

*Id.,* MVC contends it is perfectly clear. However, even if we were inclined to permit form to govern over substance, we could not rationalize this single reference to the damages as a "penalty" with the apparent contradiction contained in the subsequent clause where the fees are described as liquidated damages designed to compensate Sunman. In any even the characterization in a contract of a particular remedy as either a liquidated damage or a penalty is not conclusive; instead, the intent of the parties must be ascertained and balanced with all other factors bearing on whether the provision is enforce-able. *Beck v. Mason,* 580 N.E.2d 290 (Ind. App.1991); *Mandle,* 330 N.E.2d at 364.

The parties agree that the liquidated damages provisions were designed to compensate Sunman for the costs and expenses it incurred if MVC failed to timely complete the phases of construction. Although precise language in contracts is always preferable, we cannot say that this single apparently precise reference to a penalty undermines the solid inference from all other evidence that the liquidated damages were, in fact, intended to compensate Sunman in the event of a breach. *See, e.g.,* Sunman Reply Ex. B, Tinkle Dep. at 70.

 MVC next contends that the liquidated damages provisions are unenforceable because the fees imposed are not tailored to the type of violation Defendant has alleged. It is true that the "general rule of construction is that where a stipulated sum is made applicable to multiple promises of varied kinds and importance, then a penalty has been imposed." *Rajski,* 514 N.E.2d at 349. However, that is not the type of provision at issue here. In this case, the liquidated damages provisions were triggered if specified "big ticket" items were incomplete within the required time-frame. *Cf. Rajski,* 514 N.E.2d at 349 (deeming homeowners' association fee provision unenforceable penalty where identical fee amount was assessed for infraction involving use of non-approved garbage can as for non-residential use of property). In reversing the Court of Appeals, the Indiana Supreme Court has held:

> "[i]t is clear that all the parties intended to enter into the contract that they did and they well understood the provisions of that contract and their duties and obligations thereunder . . . [and a]ll of the[ ] parties appeared to be experienced in business operations . . . and it appears that all of them thought that $100.00 a day liquidated damages was a fair amount at the time the contract was entered into and were willing to contract in that manner. For us to find, as did the Court of Appeals, that at this point $100.00 a day is out of proportion to the damages suffered .. and therefore is a penalty, is nothing more than speculation by this Court"

**1378**

*Court Rooms of America, Inc. v. Diefenbach,* 425 N.E.2d 122, 124 (Ind.1981). The Indiana Court of Appeals had invalidated the liquidated damages provision, in part, because it was triggered by a variety of infractions, big or small, a result which the Supreme Court found clearly unacceptable. *Court Rooms of America v. Diefenbach,* 413 N.E.2d 1029, 1033 (Ind.App.1980).

Under the circumstances of this case, where the parties knowingly contracted for liquidated damages and the amount of those damages appears to be reasonable in light of the potential as well as unascertainable damages in the event of a breach, we cannot say that either the $500–per–day amount assigned to Phase II or the $1000–per–day amount assigned to Phase I was unreasonable or grossly disproportionate to Sunman's actual damages. Accordingly, the liquidated damages provisions are enforceable and MVC's motion for partial summary judgment on this basis is DENIED.

### F. *"Substantial versus Full Completion" As Required Under the Contract*

■ Finally, MVC moves for partial summary judgment on the ground that because the contract required that construction be substantially complete in order to deem its terms satisfied and to avoid the assessment of liquidated damages and because the project was in fact substantially completed as required, MVC is entitled to summary judgment on this basis. Sunman rejoins, arguing that the contract plainly required that construction be fully completed in order for liquidated damages *not* to be assessed. Both parties explain at length the purportedly unambiguous contract However, even if the standard of substantial completion is the appropriate standard, MVC would not be entitled to summary judgment Factual issues remain regarding whether MVC substantially completed its obligations under the contract, and if so, at what point in time. *See, e.g.,* MVC Motion Ex. I (letter stating that while the date for substantial completion of both construction phases is September 29, 1994, "for Phase I, the Certificate is only a *Partial* Certificate excluding the polishing ponds, since they are considered to be *not* substantially complete.") (emphasis in original).

For these reasons, we will not address further the issue of whether full or substantial completion was required under the contract between MVC and Sunman in order to avoid the assessment of liquidated damages. MVC's motion for partial summary judgment on this basis is accordingly **DENIED.**

### III. *CONCLUSION*

For the reasons discussed, MVC's motion to strike Sunman's Supplemental Submission of Exhibits is **GRANTED** and MVC's motion for partial summary judgment is **DENIED.** Genuine issues of material fact remain as to whether the contract between the parties was modified to change the status of the polishing ponds from Phase I to Phase II; Sunman did not waive, because it never intended to waive, its right to liquidated damages relating to the polishing ponds; the liquidated damages provisions in the contract are enforceable because they are reasonable and Sunman's damages were not able to be fixed at the time the parties contracted; and, finally, even if the contract required substantial completion in order for MVC to avoid liquidated damages, there remain genuine issues of material fact as to whether and when MVC substantially completed its contract obligations.